824 F.2d 156
 55 USLW 2682, 7 Fed.R.Serv.3d 1369
 In re UNITED STATES CATHOLIC CONFERENCE and National
Conference of Catholic Bishops, Appellants.
ABORTION RIGHTS MOBILIZATION, INC., Lawrence Lader, Margaret
O. Strahl, M.D., Helen W. Edey, M.D., Ruth P. Smith,
National Womens Health Network, Inc., Long Island National
Organization for Women-Nassau, Inc., Rabbi Israel Margolies,
Reverend Bea Blair, Rabbi Balfour Brickner, Reverend Robert
Hare, Reverend Marvin G. Lutz, Womens Center for
Reproductive Health, Jennie Rose Lifrieri, Eileen Walsh,
Patricia Sullivan Luciano, Marcella Michalski, Chris
Niebrzydowski, Judith A. Seibel, Karen Decrow and Susan
Sherer, Plaintiffs- Appellees,
v.
James A. BAKER, III, Secretary of the Treasury, and Roscoe
L. Egger, Jr., Commissioner of Internal Revenue, Defendants.
 No. 1486. Docket 86-6092.
 United States Court of Appeals,
Second Circuit.
 Argued June 25, 1986.
Decided June 4, 1987.
 
 Wilfred R. Caron, Gen. Counsel, U.S. Catholic Conference, Washington, D.C. (Charles H. Wilson, Richard S. Hoffman, Williams & Connolly, Mark E. Chopko, Asst. Gen. Counsel, U.S. Catholic Conference, Washington, D.C., Joseph B. Valentine, Hughes Hubbard & Reed, New York City, on brief), for appellants.
 Marshall Beil, New York City, for plaintiffs-appellees.
 Gerald T. Ford, Asst. U.S. Atty., New York City (Rudolph W. Giuliani, U.S. Atty., Jane E. Booth and Steven E. Obus, Asst. U.S. Attys., New York City, on brief), for defendants.
 Professor Edward McGlynn Gaffney, Jr., Los Angeles, Cal., and Michael J. Woodruff, Samuel E. Ericson, Kimberlee Wood Colby, Merrifield, Va., filed a brief on behalf of National Council of Churches of Christ in the U.S.A., et al., as amici curiae.
 Before NEWMAN, KEARSE and CARDAMONE, Circuit Judges.*
 JON O. NEWMAN, Circuit Judge:
 
 
 1
 This appeal from an adjudication of civil contempt presents the interesting and apparently novel question whether a non-party witness has standing on appeal to challenge a district court's subject matter jurisdiction over the lawsuit in which the witness has been compelled to furnish evidence. The issue arises on an appeal by the United States Catholic Conference ("USCC") and the National Conference of Catholic Bishops ("NCCB") (collectively "the witnesses") from orders of the District Court for the Southern District of New York (Robert L. Carter, Judge) entered May 8 and 9, 1986. The witnesses were held in civil contempt and subjected to coercive daily fines for their refusal to comply with discovery orders entered in a lawsuit brought to challenge the federal tax-exempt status of the Roman Catholic Church in the United States. The lawsuit has been brought by various organizations and individuals who contend, among other things, that they are injured by the Government's permitting the Catholic Church to retain its tax-exempt status while engaging in political activities that the plaintiffs contend violate the limitations imposed by section 501(c)(3) of the Internal Revenue Code, 26 U.S.C. Sec. 501(c)(3) (1982). The witnesses challenge the contempt adjudication solely on the ground that the plaintiffs lack standing to bring the lawsuit. Without making any definitive ruling on the standing of the plaintiffs, we conclude that the witnesses have standing to question only whether the District Court has a colorable basis for exercising subject matter jurisdiction, that such colorable basis exists, and that in the absence of any challenge to the discovery orders that implicate personal rights of the witnesses, the orders adjudicating them in civil contempt should be affirmed.
 
 I.
 
 2
 The plaintiffs are nine organizations and twenty individuals, all of whom act in one or more capacities to support the constitutional right of women to choose an abortion. Three of the organizations are active in advocating the right to an abortion. Six of the organizations are health clinics that perform abortions. The individuals include persons identified as officers of or contributors to the advocacy organizations, a physician who performs abortions, clergymen whose religious tenets hold it permissible for women to choose an abortion, and Roman Catholics who contribute to the Roman Catholic Church but oppose the Church's position on abortion. All of the individual plaintiffs are voters and taxpayers. The complaint named as defendants the Secretary of the Treasury and the Commissioner of Internal Revenue ("the federal defendants"), and the USCC and the NCCB, alleged in the complaint to be "the two principal national organizations of the Roman Catholic Church in the United States."
 
 
 3
 The complaint recites the language of section 501(c)(3) of the Internal Revenue Code, defining a tax-exempt organization as one
 
 
 4
 which does not participate in, or intervene in (including the publishing or distributing of statements), any political campaign on behalf of any candidate for public office.
 
 
 5
 26 U.S.C. Sec. 501(c)(3). The complaint alleges that this prohibition on political activity by tax-exempt organizations is constitutionally required with respect to religious organizations by the First Amendment. The plaintiffs then allege various activities undertaken by the Roman Catholic Church that are claimed to constitute "interven[tion] in political campaigns to further [the Church's] religious belief that no one should be able to obtain an abortion in the United States." These activities, undertaken without loss of the Church's tax-exempt status, are alleged to have injured the plaintiffs in various ways. The primary injury allegedly sustained is that the plaintiffs are disadvantaged in the political arena with respect to political activity on behalf of pro-abortion or pro-choice candidates because the plaintiffs abide by the political action prohibition of section 501(c)(3) while the Church allegedly does not. Some of the plaintiffs also allege that they are injured as taxpayers on the theory that a tax exemption for a religious organization engaging in political activity constitutes a government expenditure to establish a religion and injured as voters on the theory that the toleration of political activity by the Church while plaintiffs limit their activity in observance of section 501(c)(3) has diminished plaintiffs' right to vote.
 
 
 6
 The complaint alleges five causes of action. The first claims that the activities of the Roman Catholic Church violate section 501(c)(3) and the First Amendment. The remaining four allege that the failure of the federal defendants to revoke the tax-exempt status of the Catholic Church violate their duties under the Code and various provisions of the Constitution.
 
 
 7
 All four of the original defendants moved to dismiss on various grounds, including the plaintiffs' lack of standing and failure to state a claim. On July 19, 1982, the District Court granted the motion by the USCC and the NCCB to dismiss Count One for failure to state a claim. Abortion Rights Mobilization, Inc. v. Regan, 544 F.Supp. 471, 487 (S.D.N.Y.1982). Since this was the only count alleging a cause of action against the two Catholic organizations, that ruling removed them from the case as defendants. The Court denied the motion by the federal defendants, concluding that, except for five health service clinics, all other plaintiffs had standing to sue. The District Judge also denied a motion by the federal defendants to certify his ruling denying their motion to dismiss for interlocutory appeal pursuant to 28 U.S.C. Sec. 1292(b). Abortion Rights Mobilization, Inc. v. Regan, 522 F.Supp. 364 (S.D.N.Y.1982).
 
 
 8
 In early 1983, both the plaintiffs and the federal defendants served deposition subpoenas duces tecum on the USCC and the NCCB. The plaintiffs' subpoenas, which were received by the witnesses' counsel on March 2, 1983, have given rise to the pending appeal. These subpoenas seek various documents concerning allegedly political activities engaged in by the USCC and the NCCB, including records of financial support of political candidates and organizations. On April 4, 1984, the District Court denied a motion to quash the plaintiffs' subpoenas. No production of documents occurred, the witnesses apparently anticipating that their obligation to comply might be removed by an anticipated decision of the Supreme Court in litigation concerning the standing of parents of Negro children to challenge the tax-exempt status of racially segregated private schools. See Allen v. Wright, 468 U.S. 737, 104 S.Ct. 3315, 82 L.Ed.2d 556 (1984). Shortly after the Supreme Court ruled against standing in Allen v. Wright, supra, the federal defendants renewed their motion to dismiss. The District Court denied that motion on March 1, 1985, Abortion Rights Mobilization, Inc. v. Regan, 603 F.Supp. 970 (S.D.N.Y.1985), and subsequently denied certification for interlocutory appeal under section 1292(b).
 
 
 9
 On June 18, 1985, the plaintiffs sought enforcement of their subpoenas by moving for an order holding the witnesses in contempt. In subsequent pretrial conferences, the District Court questioned whether two paragraphs of the subpoenas, those calling for production of minutes of internal church meetings, might encounter First Amendment objections. In an order on September 4, 1985, Judge Carter ruled that documents called for by these two paragraphs need not be produced "at this time," and that these requests should be narrowed. At the same time he ordered the witnesses to comply "forthwith" with all other requests of the subpoenas and denied the plaintiffs' motion for contempt, without prejudice to renewal in the event of noncompliance. Thereafter, the plaintiffs withdrew the two questioned paragraphs of their subpoenas and also agreed with the witnesses to the entry of a confidentiality order.
 
 
 10
 Compliance was delayed pending the outcome of a mandamus petition to this Court, challenging Judge Carter's denial of the federal defendants' renewed motion to dismiss. This Court denied the mandamus petition on January 14, 1986, in an unreported order. In re Baker, 788 F.2d 3 (2d Cir.1986). On February 26, 1986, Judge Carter denied plaintiffs' renewed motion to hold the witnesses in contempt, again without prejudice to renewal. However, he directed the witnesses to comply with the subpoenas by March 7, 1986, unless this Court in the interim granted rehearing of the ruling denying mandamus. This Court denied rehearing on March 3, 1986. Thereafter plaintiffs renewed their motion to hold the witnesses in contempt.
 
 
 11
 On May 8, 1986, Judge Carter issued the ruling that is the subject of this appeal. Abortion Rights Mobilization, Inc. v. Baker, 110 F.R.D. 337 (S.D.N.Y.1986). Noting the prolonged period during which the witnesses had refused to comply with the subpoenas, a period then extending more than three years, Judge Carter expressed the view that the witnesses had "wilfully misled the court and the plaintiffs and made a travesty of the court process." Id. at 337. The District Court ruled that the witnesses were in civil contempt for refusing to comply with the February 26, 1986, order of the Court requiring document production. Judge Carter imposed a daily fine of $50,000 commencing May 12, 1986, until the witnesses complied. On May 9, 1986, Judge Carter amended his May 8 ruling to entitle the plaintiffs to attorney's fees with respect to designated aspects of the pretrial proceedings, with the amount of fees to be determined after disposition of this appeal. He also stayed the May 8 order until May 16, 1986. This Court subsequently continued that stay pending disposition of this appeal.
 
 Discussion
 
 12
 A witness adjudicated in civil contempt for failure to comply with discovery orders unquestionably has a right to appeal from the contempt order, notwithstanding the lack of a final judgment in the underlying lawsuit in which discovery was sought. E.g., In re Manufacturers Trading Corp., 194 F.2d 948 (6th Cir.1952); Fenton v. Walling, 139 F.2d 608 (9th Cir.), cert. denied, 321 U.S. 798, 64 S.Ct. 938, 88 L.Ed. 1086 (1944); see Alexander v. United States, 201 U.S. 117, 122, 26 S.Ct. 356, 358, 50 L.Ed. 686 (1906); see generally 9 Moore's Federal Practice p 110.13 at 167 (1986 & Supp.1986-87). In this respect a witness has appellate rights superior to those of a party. A party held in civil contempt in the course of a civil lawsuit may not obtain review of the contempt order prior to an appeal from a final judgment in the underlying lawsuit. International Business Machines Corp. v. United States, 493 F.2d 112, 117-19 (2d Cir.1973), cert. denied, 416 U.S. 995, 94 S.Ct. 2409, 40 L.Ed.2d 774 (1974).
 
 
 13
 In challenging their adjudication of civil contempt, the USCC and the NCCB make no claim whatever concerning the substance of either the orders requiring them to comply with the subpoenas duces tecum or the order holding them in contempt for noncompliance. The only claim made on this appeal is that the District Court lacks subject matter jurisdiction of the plaintiffs' suit against the federal defendants; in urging that jurisdiction is lacking, the witnesses, supported by the federal defendants, argue that the plaintiffs lack standing. Thus, the threshold issue we confront is whether the witnesses have standing to challenge their contempt adjudication on the ground that the District Court lacks subject matter jurisdiction over the lawsuit in which they have been obliged to produce evidence.[1] The issue appears to be one of first impression, at least in the context of civil litigation.
 
 
 14
 The most pertinent authority is the decision of the Supreme Court in Blair v. United States, 250 U.S. 273, 39 S.Ct. 468, 63 L.Ed. 979 (1919). In that case three witnesses were subpoenaed in Michigan to testify and produce records before a federal grand jury in the Southern District of New York. The grand jury was investigating possible violations of federal election laws in connection with a primary to select a candidate for United States Senator from Michigan. The witnesses appeared but refused to testify. They contended that the federal election laws were unconstitutional to the extent that they were sought to be applied to primary elections and that "because of the invalidity of these statutes, neither the United States district court nor the federal grand jury has jurisdiction to inquire into primary elections or to indict or try any person for an offense based upon the statutes...." Id. at 278-79, 39 S.Ct. at 470. The witnesses were adjudicated in civil contempt and held in custody until they complied with the subpoenas.
 
 
 15
 The Supreme Court affirmed the denial of writs of habeas corpus. The Court declined to consider the jurisdictional objections sought to be raised by the witnesses, stating that a witness "is not interested to challenge the jurisdiction of court or grand jury over the subject-matter that is under inquiry." Id. at 279, 39 S.Ct. at 470 (emphasis added). Qualifying this statement slightly, the Court said that a witness "is not entitled to challenge the authority of the court or of the grand jury, provided they have a de facto existence and organization." Id. at 282. See In re Maury Santiago, 533 F.2d 727, 730 (1st Cir.1976).
 
 
 16
 A party entitled to appeal an interlocutory ruling may challenge the subject matter jurisdiction of the district court over the lawsuit in which the ruling was made, see Delta Coal Program v. Libman, 743 F.2d 852, 854 (11th Cir.1984) (appeal of order permitting substitution of plaintiffs); San Filippo v. United Brotherhood of Carpenters & Joiners, 525 F.2d 508, 513 (2d Cir.1975) (appeal of preliminary injunction). But cf. Marrese v. American Academy of Orthopaedic Surgeons, 726 F.2d 1150, 1158 (7th Cir.1984) (in banc) (party held in criminal contempt for failure to produce required discovery may not challenge on appeal from contempt adjudication a res judicata ruling that would defeat the underlying lawsuit), rev'd on other grounds, 470 U.S. 373, 105 S.Ct. 1327, 84 L.Ed.2d 274 (1985). However, Blair stands for the proposition that a witness has more limited standing. Though the contempt adjudication of the witness is final and hence appealable, that appeal brings up for review only issues in which the witness is legally "interested," Blair v. United States, supra. Doubtless, these would include any issue that concerns the witness personally, such as the district court's personal jurisdiction over the witness, see United States v. Thompson, 319 F.2d 665, 668 (2d Cir.1963), or any privilege the witness may have to resist divulging the information sought, see Hickman v. Taylor, 153 F.2d 212, 214 (3d Cir.1945) (in banc), aff'd, 329 U.S. 495, 67 S.Ct. 385, 91 L.Ed. 451 (1947). With respect to jurisdiction over the underlying action, however, Blair instructs that the witness may make only the limited challenge as to whether there exists a colorable basis for exercising subject matter jurisdiction, and not a full-scale challenge to the correctness of the district court's exercise of such jurisdiction.
 
 
 17
 The federal defendants contend that Blair should be limited to the context of a grand jury witness. They view Blair as merely an example of the Court's philosophy that "encouragement of delay is fatal to the vindication of the criminal law," Cobbledick v. United States, 309 U.S. 323, 325, 60 S.Ct. 540, 541, 84 L.Ed. 783 (1940). It is true that Blair discusses the traditionally broad scope of a grand jury's authority, 250 U.S. at 282-83, 39 S.Ct. at 471. But we think the decision was intended to state a rule of wider application. The Court's opinion surveys a range of statutes imposing a general obligation on witnesses in all proceedings to give testimony, subject only to constitutional and other privileges. Id. at 280-81, 39 S.Ct. at 470-71. Explicit reference is made to witnesses in civil cases. Id. at 280, 39 S.Ct. at 470. From this review the Court concludes, "In all of these provisions, as in the general law upon the subject, it is clearly recognized that the giving of testimony and the attendance upon court or grand jury in order to testify are public duties which every person within the jurisdiction of the Government is bound to perform upon being properly summoned...." Id. at 281, 39 S.Ct. at 471 (emphasis added). After this discussion the Court states as a rule that a witness "is not entitled to challenge the authority of the court or of the grand jury, provided they have a de facto existence and organization." Id. at 282, 39 S.Ct. at 471 (emphasis added). If the Supreme Court in Blair had intended to rely on the broad scope of a grand jury's investigative authority rather than the narrow scope of a witness's permissible challenge to subject matter jurisdiction, one would have expected the Court to entertain the witness's jurisdictional challenge and summarily reject it on its merits. Instead, the Court upheld the contempt adjudication, not because the questions asked of the witness were found to be within the grand jury's far-ranging authority, but because the witness had no standing to complain that subject matter jurisdiction had been exceeded.
 
 
 18
 Moreover, the federal defendants take a somewhat inconsistent position in urging us to limit Blair to grand jury witnesses because of the strong policy of avoiding delay in criminal cases. Expanding their argument that the witnesses in this civil case have standing to challenge the subject matter jurisdiction of the District Court in the underlying lawsuit, the federal defendants contend that a witness in a criminal trial could make a similar challenge to a contempt adjudication for failure to testify. Letter from Assistant United States Attorney Gerald T. Ford to Clerk of Court (June 26, 1986). We agree that a witness's standing to challenge subject matter jurisdiction in an underlying lawsuit should not depend on whether that suit is civil or criminal, but we think that such standing is unavailable regardless of the nature of the proceeding to which the witness is called.
 
 
 19
 Furthermore, we note the interesting citation of Blair by the Supreme Court in Valley Forge Christian College v. Americans United for Separation of Church and State, Inc., 454 U.S. 464, 102 S.Ct. 752, 70 L.Ed.2d 700 (1982), a case principally relied on by the witnesses and the federal defendants in support of their challenge to the subject matter jurisdiction of the District Court. In ruling against standing to challenge a governmental donation of property alleged to violate the Establishment Clause, the Court noted that it had regularly " 'refrain[ed] from passing upon the constitutionality of an act [of the representative branches] unless obliged to do so in the proper performance of our judicial function, when the question is raised by a party whose interests entitle him to raise it.' Blair v. United States, 250 U.S. 273, 279, 39 S.Ct. 468, 470, 63 L.Ed. 979 (1919)." Id. at 474, 102 S.Ct. at 759; (brackets in original; emphasis added). Apparently the Court believed that Blair had relevance to the civil context.
 
 
 20
 More fundamental than their effort to restrict Blair to the grand jury context is the contention of the witnesses and the federal defendants that the lack of subject matter jurisdiction over the underlying lawsuit impairs the power of the district court to order the witnesses to produce evidence and to adjudicate them in contempt for their refusal. If the absence of subject matter jurisdiction over the underlying suit would preclude the District Court from ordering a witness to produce evidence and effecting compliance, then we would agree that the witness would have standing to assert such a claim on appeal from an adjudication of contempt. We disagree, however, with the premise.
 
 
 21
 A lack of subject matter jurisdiction does not disable a district court from exercising all judicial power. It is familiar ground that even a court lacking subject matter jurisdiction may conduct appropriate proceedings to determine whether it has jurisdiction and that such proceedings may include the issuance of an injunction to preserve the status quo and an adjudication of criminal contempt for violation of such an injunction. See United States v. United Mine Workers, 330 U.S. 258, 293, 67 S.Ct. 677, 695, 91 L.Ed.2d 884 (1947); Gompers v. Bucks Stove & Range Co., 221 U.S. 418, 436-37, 31 S.Ct. 492, 496, 55 L.Ed. 797 (1911); United States v. Shipp, 203 U.S. 563, 573, 27 S.Ct. 165, 166, 51 L.Ed. 319 (1906). At least that is so unless the claim of subject matter jurisdiction is "frivolous and not substantial," United States v. United Mine Workers, supra, 330 U.S. at 293, 67 S.Ct. at 695-96, or the "court is so obviously traveling outside its orbit as to be merely usurping judicial forms and facilities," id. at 309, 67 S.Ct. at 704 (Frankfurter, J., concurring).
 
 
 22
 The Mine Workers principle, though usually stated to apply to a court's "jurisdiction to determine its jurisdiction," is really an illustration of a somewhat broader point: In some circumstances the orderly processes of the courts must be observed even if it is subsequently determined by an appellate court that the trial court lacked subject matter jurisdiction. For example, a witness in a civil trial could not disrupt the courtroom and then escape the penalties of criminal contempt by successfully arguing that the court lacked subject matter jurisdiction over the suit between the civil litigants. The proper discharge of the judicial function requires that a court's lack of power to adjudicate the rights of the primary litigants not defeat the court's ability to command the witness to cease his disruption. Compelling a recalcitrant witness to furnish unprivileged evidence is admittedly less vital to the judicial function than maintaining courtroom order, but it is sufficiently integral to that function to justify use of such authority despite lack of jurisdiction to adjudicate rights between primary litigants.
 
 
 23
 Still, it is arguable that a court's authority to punish courtroom disorder or witness recalcitrance with criminal contempt sanctions does not authorize the imposition of civil contempt sanctions without affording the contemnor an opportunity to contest subject matter jurisdiction over the underlying suit. This argument, which seems inconsistent with the normal rule that civil contempt measures must be used before the more drastic sanctions of criminal contempt are employed, see Shillitani v. United States, 384 U.S. 364, 371 n. 9, 86 S.Ct. 1531, 1536 n. 9, 16 L.Ed.2d 622 (1966), draws some support from the decision in Mine Workers. As the Court there observed,
 
 
 24
 It does not follow, of course, that simply because a defendant may be punished for criminal contempt for disobedience of an order later set aside on appeal, that the plaintiff in the action may profit by way of a fine imposed in a simultaneous proceeding for civil contempt based upon a violation of the same order. The right to remedial relief falls with an injunction which events prove was erroneously issued ... and a fortiori when the injunction or restraining order was beyond the jurisdiction of the court.
 
 
 25
 330 U.S. at 294-95, 67 S.Ct. at 696 (citations and footnote omitted). That rule, however, applies to prevent one party to a lawsuit from profiting at the expense of another party in a suit over which the trial court is ultimately determined to lack subject matter jurisdiction. It does not necessarily apply to bar a plaintiff from retaining a fine imposed upon a witness as a coercive sanction to compel the furnishing of unprivileged evidence. However, we need not decide at this stage of this litigation what rights the plaintiffs may ultimately have to any coercive fines the witnesses may pay. Cf. International Business Machines Corp. v. United States, supra, 493 F.2d at 119 (raising possibility that a party-contemnor might pay a civil contempt sanction and later make a claim for return of its money). Since the contempt order has been stayed, no such payments have been made, and we prefer to believe that the witnesses will abide by any orders of the district court once the stay is terminated. We need not speculate about issues that would arise only if recalcitrance continues, coercive fines are paid, and subsequently, on appeal from a final judgment in the underlying action, subject matter jurisdiction is determined to have been lacking.
 
 
 26
 Even if the witnesses and the federal defendants were correct in urging that Blair decided only that a grand jury witness lacks standing to challenge subject matter jurisdiction, that decision nonetheless strongly supports our basic point that a court's lack of subject matter jurisdiction does not disable it from acting in some matters in addition to the ascertainment of its own jurisdiction. Moreover, there are important practical reasons for concluding that the compulsion of unprivileged evidence is one such matter on which the trial court should be free to act, unimpeded by interlocutory appellate inquiry into its subject matter jurisdiction over the underlying litigation. It is well settled that a party may not take an interlocutory appeal from the denial of its motion to dismiss for lack of subject matter jurisdiction. See Catlin v. United States, 324 U.S. 229, 233, 65 S.Ct. 631, 89 L.Ed. 911 (1945). If a recalcitrant witness had standing to challenge subject matter jurisdiction on an appeal from an adjudication of civil contempt, the way would be open for easy circumvention of this salutary rule. The defendant could effectively precipitate appellate review of a district court's ruling upholding subject matter jurisdiction by serving a discovery request on a friendly witness, who could obligingly resist solely on the ground that subject matter jurisdiction of the underlying suit was lacking. The witness would realistically be exposed only to the sanction of civil contempt,[2] and would be obliged to pay money immediately only if the contempt order was not stayed pending appeal, normally a slight risk and one that the defendant would very likely assume. If the contempt adjudication was affirmed, the witness would promptly comply; if it was reversed for lack of subject matter jurisdiction, the suit would be dismissed. Interlocutory review of the denial of the motion to dismiss would thereby be achieved.
 
 
 27
 The authorities relied on by the witnesses and the federal defendants to permit their challenge to subject matter jurisdiction are not persuasive. Bender v. Williamsport Area School District, 475 U.S. 534, 106 S.Ct. 1326, 89 L.Ed.2d 501 (1986), held that a person not a party to a lawsuit could not appeal from a decision in the suit with which he disagreed. That holding does not help the witnesses who are seeking to challenge a ruling in the lawsuit between the plaintiffs and the federal defendants, to which they are not parties. In Bender the Court noted the traditional rule that on every appeal a court is obliged to consider the question of its own jurisdiction and that of the court from which the appeal is taken " 'without respect to the relation of the parties to [such question].' " Id. at 1334 (quoting Mansfield, Coldwater & Lake Michigan Ry. v. Swan, 111 U.S. 379, 382, 4 S.Ct. 510, 511, 28 L.Ed. 462 (1884)). If we were reviewing a final judgment in the underlying suit, we would of course be obliged to consider the District Court's jurisdiction to enter that judgment, whether or not any party to the suit raised the issue. But Bender does not determine whether an appeal from an adjudication of a witness's civil contempt obliges or even permits a reviewing court to consider the trial court's jurisdiction over the underlying lawsuit. In the pending case, we will observe the traditional rule expressed in Bender by inquiring only whether the District Court had sufficient jurisdiction to enable it to adjudicate the witnesses in civil contempt.
 
 
 28
 Marrese v. American Academy of Orthopaedic Surgeons, supra, involved a civil defendant held in criminal contempt for failure to obey a discovery order. The defendant resisted on the ground that the action against it was barred by res judicata. The Seventh Circuit agreed and ordered the suit dismissed, a ruling subsequently reversed by the Supreme Court, 470 U.S. 373, 105 S.Ct. 1327, 84 L.Ed.2d 274 (1985). In a passage not affected by the Supreme Court's reversal, the Seventh Circuit observed that "if it turns out that [a] lawsuit should not have been pending because it was barred at the outset by res judicata we think it follows logically and practically that the discovery order exceeded the judge's authority." 726 F.2d at 1158. That passage may well be correct with respect to discovery directed against a party, a point we need not resolve on this appeal. It is surely correct with respect to discovery directed at a party that is resisted on the ground that the court lacks subject matter jurisdiction over the lawsuit involving the party. See United States v. Morton Salt Co., 338 U.S. 632, 642, 70 S.Ct. 357, 363, 94 L.Ed. 401 (1950). We do not think it correct, however, with respect to discovery directed at a witness. However that may be, the most pertinent aspect of the Seventh Circuit decision cuts decisively against the position of the witnesses on this appeal. Judge Posner was careful to point out that the defendant-contemnor could not secure interlocutory review of the denial of its motion to dismiss on res judicata grounds by the simple expedient of resisting discovery and raising the res judicata point on appeal from an adjudication of contempt. Review of the res judicata ruling was not permitted in the appeal from the contempt judgment but was permitted only in the "independent appeal" resulting from the District Court's certification of its res judicata ruling for interlocutory review pursuant to 28 U.S.C. Sec. 1292(b). See Marrese v. American Academy of Orthopaedic Surgeons, supra, 726 F.2d at 1158. Thus, a holding of Marrese, not disturbed by the Supreme Court's reversal on the merits of the res judicata issue, is that a defendant-contemnor appealing from a contempt adjudication for refusing to comply with discovery orders may not challenge a ruling of the trial court that, if correctly made, would end the civil suit in which the discovery was ordered.
 
 
 29
 United States v. Thompson, supra, concerned adjudication of civil contempt against an American citizen who failed to comply with a grand jury subpoena issued by the District Court for the Southern District of New York and served on the witness in the Philippines. We upheld the witness's contention that service of a grand jury subpoena abroad was not authorized by 28 U.S.C. Sec. 1783 as it existed in 1962 when the subpoena was served. Because personal jurisdiction was not validly obtained, the witness was not obligated to comply with the subpoena, and the contempt was therefore reversed. The case stands as an instructive contrast to United States v. Blair, supra. Thompson was allowed to raise on appeal an issue personal to him, the lack of lawful service of process. Blair was not allowed to challenge an issue in which he was "not interested," United States v. Blair, supra, 250 U.S. at 279, 39 S.Ct. at 470, the subject matter jurisdiction of the district court and the grand jury over the matter being investigated by the grand jury.
 
 
 30
 We conclude that the witnesses in the instant case may challenge their contempt adjudication only on the limited ground that the District Court lacks even colorable jurisdiction over the underlying lawsuit. An order of a court that is "usurping judicial forms and facilities," Mine Workers, supra, 330 U.S. at 309, 67 S.Ct. at 704 (Frankfurter, J., concurring), need not be obeyed. But if such colorable jurisdiction exists, a witness may not challenge plaintiffs' standing in the underlying action or raise other issues that might demonstrate that the District Court has erroneously exercised subject matter jurisdiction over that action. This distinction between an erroneous assertion of subject matter jurisdiction and a clear usurpation of judicial power has been fully developed in cases considering the availability of a collateral attack on a judgment entered after litigation of subject matter jurisdiction. See Nemaizer v. Baker, 793 F.2d 58, 65 (2d Cir.1986) (collecting cases); Restatement (Second) of Judgments Sec. 12(1) (1980). Collateral attack is available only if the assertion of subject matter jurisdiction was without colorable basis, not merely erroneous.
 
 
 31
 In the instant case, though the issue of subject matter jurisdiction over the underlying lawsuit is a substantial question, the District Court cannot be said to be usurping power in determining that subject matter jurisdiction exists. Plaintiffs' suit is more than a citizen effort to have the tax laws enforced and more than a taxpayer effort to complain of tax exemptions of others that might violate the Establishment Clause. The plaintiffs have claimed direct, personal injury arising from the fact that the federal defendants' failure to enforce the political action limitations of section 501(c)(3) has placed the plaintiffs at a competitive disadvantage with the Catholic Church in the arena of public advocacy on important public issues. That is a substantial basis on which to predicate standing.[3] We need determine no more than that to conclude that the District Court had at least a colorable basis for the exercise of subject matter jurisdiction over the plaintiffs' suit.
 
 
 32
 The judgment of the District Court is affirmed.
 
 KEARSE, Circuit Judge, concurring:
 
 33
 I concur in Judge Newman's thorough opinion, but write separately to emphasize what I view as the narrow scope of the issue presented on this appeal and to add a reason for rejecting the appeal.
 
 
 34
 Though both the majority and dissenting opinions discuss a witness's standing to challenge the court's subject matter jurisdiction of the litigation, the question of subject matter jurisdiction may have many ingredients; this appeal involves only the ingredient of the plaintiffs' standing to bring the litigation. While certain other ingredients of subject matter jurisdiction, such as the existence of a federal question or the grant by Congress to the federal courts of the power to adjudicate a particular question, may be determined principally by legal analysis, the question of a plaintiff's standing to sue often turns on his ability to make showings that are largely factual, see, e.g., Gladstone, Realtors v. Village of Bellwood, 441 U.S. 91, 109-15 & nn. 29, 31, 99 S.Ct. 1601, 1612-15 & nn. 29, 31, 60 L.Ed.2d 66 (1979); Duke Power Co. v. Carolina Environmental Study Group, Inc., 438 U.S. 59, 74-77, 98 S.Ct. 2620, 2630-32, 57 L.Ed.2d 595 (1978); United States v. Students Challenging Regulatory Agency Procedures (SCRAP), 412 U.S. 669, 688-90 & n. 15, 93 S.Ct. 2405, 2416-17 & n. 15, 37 L.Ed.2d 254 (1973). For example, he must demonstrate that there is actual or threatened injury, that such injury is fairly traceable to defendant's illegal conduct, and that there is a substantial likelihood that such injury will be redressed by the relief requested. See, e.g., Allen v. Wright, 468 U.S. 737, 751, 104 S.Ct. 3315, 3324, 82 L.Ed.2d 556 (1984). To make such largely factual showings, a plaintiff may well need, as in this case, to obtain discovery from a nonparty witness.
 
 
 35
 We all agree that the court has jurisdiction, or power, to determine whether or not it has subject matter jurisdiction. One purpose of recognizing this power is to permit informed, reliable decisions on the jurisdictional issue of the plaintiff's standing. Where the needed showing as to standing is largely factual, the court must have the power to permit the plaintiffs to conduct a reasonable amount of discovery, if necessary, to prove to the court that they do have standing. Where there is at least a colorable basis for standing, it would be unsound to allow the witnesses to abort discovery relating to standing by arguing that the plaintiffs have no actual standing.
 
 
 36
 Thus, to the extent that the discovery sought in the present case seeks information pertinent to the issue of plaintiffs' standing, this relevance provides a reason in addition to those discussed in the majority opinion for affirmance of the decision of the district court.
 
 CARDAMONE, Circuit Judge, dissenting:
 
 37
 The United States Catholic Conference and the National Conference of Catholic Bishops, (collectively "the witnesses"), seek to overturn a civil contempt order issued against them for their refusal to obey a discovery order. The witnesses--who are not parties to the underlying action below--maintain that the district court may not properly compel their production of over 20,000 pages of documents because it lacks subject matter jurisdiction over the underlying controversy. In response, the majority for the first time holds that a non-party witness may not successfully challenge subject matter jurisdiction, except where the district court lacks "colorable" jurisdiction over the underlying action. Its rationale appears to be that non-party witnesses have no "personal" interest in the court's authority or lack of authority to adjudicate the matter before it. The legal question is whether non-party witnesses held in civil contempt may presently challenge the subject matter jurisdiction of the district court over the underlying action. The majority says "not now". But because this challenge has no tomorrow the law holds that it must be made "now or never".
 
 
 38
 Since a federal court's power to issue discovery and civil contempt orders derives from and necessarily depends on its jurisdictional power to hear the underlying action before it, I would hold that these witnesses are entitled on this appeal to challenge the district court's subject matter jurisdiction and respectfully dissent from the majority's contrary holding.
 
 
 39
 * A. The Court's Power to Issue Discovery and Contempt Orders Derives from its Subject Matter Jurisdiction Over the Underlying Action
 
 
 40
 Article III courts have jurisdiction only to hear "cases" and "controversies." U.S. Const. art. III, Sec. 2, cl. 1; Allen v. Wright, 468 U.S. 737, 750, 104 S.Ct. 3315, 3324, 82 L.Ed.2d 556 (1984). With few exceptions, exercises of judicial power by Article III courts must derive from this constitutional grant. Actions taken in excess of those powers are null and void because actions taken without such jurisdiction are an "usurp[ation of] judicial forms and facilities", United States v. United Mine Workers, 330 U.S. 258, 309, 67 S.Ct. 677, 704, 91 L.Ed. 884 (1947) (Frankfurter, J., concurring). These rules apply with equal force to civil contempt proceedings. It has been established law for over 100 years that a district court must have subject matter jurisdiction over the suit before it may issue a valid contempt order. See, e.g., Ex parte Rowland, 104 U.S. (14 Otto) 604, 612, 26 L.Ed. 861 (1881). When it acts in excess of its jurisdiction, the order punishing a person for contempt is void. Id. at 612, 617-18; see also In re Burrus, 136 U.S. 586, 597, 10 S.Ct. 850, 854, 34 L.Ed. 500 (1890); In re Sawyer, 124 U.S. 200, 221-22, 8 S.Ct. 482, 493, 31 L.Ed. 402 (1888); Ex parte Fisk, 113 U.S. 713, 726, 5 S.Ct. 724, 730, 28 L.Ed. 1117 (1885).
 
 
 41
 The seminal decision in United Mine Workers demonstrates that these constitutional mandates continue to control civil contempt. In that case, the United States sued to restrain a coal strike in a mine seized earlier by the government. The district court issued a temporary restraining order to preserve the status quo. When the mine workers struck, they were held in contempt. Affirming the criminal contempt conviction, the Supreme Court held that district court orders must be obeyed until set aside, even when it ultimately is determined that the district court was deprived by statute of the jurisdiction necessary to issue the order. 330 U.S. at 293, 67 S.Ct. at 695.
 
 
 42
 In so holding, the Court noted two important distinctions relevant to the issue before us. First, while the contempt order's validity does not depend on the ultimate constitutionality of the statute under which is issued, it must nevertheless be issued by a court with jurisdiction over the subject matter of the underlying litigation:[W]e find impressive authority for the proposition that an order issued by a court with jurisdiction over the subject matter and person must be obeyed by the parties until it is reversed by orderly and proper proceedings.
 
 
 43
 Id. (footnote omitted and emphasis added). Insistence on a duty of obedience to a court order is therefore appropriate only when the "subject matter of the suit, as well as the parties, are properly before the court." Id. at 294, 67 S.Ct. at 696.
 
 
 44
 Second, and most importantly, the Supreme Court stated that a civil contempt order--like the one on this appeal--would not survive a reversal for lack of subject matter jurisdiction:
 
 
 45
 It does not follow, of course, that simply because a defendant may be punished for criminal contempt for disobedience of an order later set aside on appeal, that the plaintiff in the action may profit by way of a fine imposed in a simultaneous proceeding for civil contempt based upon a violation of the same order. The right to remedial relief falls with an injunction which events prove was erroneously issued, ... and a fortiori when the injunction or restraining order was beyond the jurisdiction of the court.
 
 
 46
 Id. at 294-95, 67 S.Ct. at 696 (emphasis added). The Supreme Court then went on to state that, despite its affirmance of the criminal contempt conviction, it would nevertheless set aside the civil contempt judgment. Id. at 295, 67 S.Ct. at 696. Thus, this holding teaches lower courts that their power to issue a civil contempt order derives from and depends upon their subject matter jurisdiction over the underlying action. See also In re Marc Rich & Co., 707 F.2d 663, 669 (2d Cir.), cert. denied, 463 U.S. 1215, 103 S.Ct. 3555, 77 L.Ed.2d 1400 (1983) ("A federal court's jurisdiction is not determined by its power to issue a subpoena; its power to issue a subpoena is determined by its jurisdiction.")
 
 
 47
 After United Mine Workers, the Supreme Court in United States v. Morton Salt Co., 338 U.S. 632, 70 S.Ct. 357, 94 L.Ed. 401 (1950), specifically addressed the derivative nature of evidentiary subpoenas. Morton Salt stated that a court's ability to summon evidence is dependent on its having subject matter jurisdiction over the action before it. The Court compared the subpoena power of administrative agencies with the judicial subpoena power, and noted that "[t]he judicial subpoena power ... is subject to those limitations inherent in the body that issues them because of the provisions of the Judiciary Article of the Constitution." Id. at 642, 70 S.Ct. at 363. While "judicial power is reluctant if not unable to summon evidence until it is shown to be relevant to issues in litigation," administrative agencies have "a power of inquisition ... which is not derived from the judicial function. It is more analogous to the Grand Jury, which does not depend on a case or controversy for power to get evidence...." Id. (emphasis added). In the colorful words of Justice Jackson, "[t]he courts could not go fishing...." Id.
 
 
 48
 A recent Seventh Circuit case forcefully illustrates the point. In Marrese v. American Academy of Orthopaedic Surgeons, 726 F.2d 1150 (7th Cir.1984) (en banc), rev'd on other grounds, 470 U.S. 373, 105 S.Ct. 1327, 84 L.Ed.2d 274 (1985), a civil defendant was held in contempt for disobeying a discovery order. The defendant resisted the order on the ground that the underlying lawsuit was barred by res judicata. The Seventh Circuit agreed but was later reversed by the Supreme Court. In a holding unaffected by the reversal, the Seventh Circuit discussed the scope of review on appeal from a contempt order. It concluded that an appeal from a contempt order brings up for appellate review the validity of the discovery order
 
 
 49
 If a party is willing to pay the price of being punished for contempt (or suffering an equivalent sanction such as dismissal of the complaint) if the validity of the order he has disobeyed is ultimately upheld, he can get immediate review of that order by appealing from the contempt judgment.... If the underlying order is invalidated, the contempt judgment falls with it.
 
 
 50
 726 F.2d at 1157. Having determined that the discovery order's validity was properly before it, the Seventh Circuit then addressed whether the discovery order was invalid because the suit itself should have been barred by res judicata stating
 
 
 51
 [W]e believe that the discovery order does fall with the underlying suit. You cannot (with exceptions not pertinent here) get discovery in the federal courts unless you have a pending lawsuit, and if it turns out that the lawsuit should not have been pending because it was barred at the outset by res judicata we think it follows logically and practically that the discovery order exceeded the judge's authority.
 
 
 52
 And, as we have noted, if the order is invalid the contempt judgment must be set aside.
 
 
 53
 Id. at 1158.
 
 
 54
 Thus, under Marrese, plaintiffs have no right to obtain discovery unless there is a pending lawsuit. If it is determined that the lawsuit should not have been pending because the district court lacked subject matter jurisdiction, then the discovery order falls because it exceeds the district court's jurisdiction. And, if the discovery order exceeds the judge's authority, the contempt judgment for its disobedience must a fortiori be vacated.
 
 
 55
 The majority implicitly recognizes the derivative nature of the district court's contempt powers when it concludes that the lower court must have at least "colorable" jurisdiction over the case before it may constitutionally issue binding orders. It accepts the proposition that the district court's power to issue a contempt order depends, at least in part, on its subject matter jurisdiction over the underlying action. Nevertheless, the majority rejects the application of the derivative argument to this case on the ground that the contemnors in United Mine Workers and Marrese were parties. Instead it suggests that the rule of United Mine Workers "does not necessarily" apply when the contemnor is a non-party witness.
 
 
 56
 The flaw in this distinction between party and non-party contemnors is threefold. First, while the Supreme Court did state that the plaintiff, i.e. a party, to the action may not profit from an erroneously issued order, it did not indicate--much less hold--that the payor-contemnor must also be a party. 330 U.S. at 295, 67 S.Ct. at 696. Second, the distinction seems contrary to the fundamental principle that a plaintiff's right to monetary relief "is dependent upon the outcome of the basic controversy." Id. at 304. A plaintiff's right to collect a fine for a civil contempt falls with the determination that the issuing court lacked subject matter jurisdiction. Id. at 294-95, 67 S.Ct. at 696. It seems unreasonable to suggest that this rule loses force when the indicated payor-contemnor is a non-party. Finally, the distinction simply ignores the fact that disobeying and risking contempt was the only avenue available for the witnesses to obtain appellate review of the discovery order. See United States v. Ryan, 402 U.S. 530, 532-33, 91 S.Ct. 1580, 1581-82, 29 L.Ed.2d 85 (1971); Marrese, 726 F.2d at 1158. In fact, the majority's reluctance to decide whether the witnesses would be entitled to a refund of any fines should subject matter jurisdiction ultimately be found lacking, reveals its own dissatisfaction with the party/non-party distinction.
 
 
 57
 The majority also raises a separate objection with respect to Marrese's application here. It correctly points out that the Seventh Circuit did not review the res judicata determination as part of its review of the appeal from the contempt judgment, but on review of an independent appeal taken pursuant to 28 U.S.C. Sec. 1292(b). See 726 F.2d at 1158. Consequently, it views Marrese as prohibiting, on appeal from a contempt judgment, appellate review of a trial court ruling whose determination may be dispositive of the underlying litigation.
 
 
 58
 This analysis overlooks the Seventh Circuit's rationale. That court correctly noted that no one can obtain appellate review of the merits of his contention without waiting for a final judgment to be entered or an interlocutory appeal to be certified under Sec. 1292(b). Id. Since the contemnor in Marrese was a party --who could raise the res judicata issue on an appeal from a final judgment in the underlying action--the court did not want to allow the defendant to circumvent the final judgment rule by obtaining a substantive review of his claim on appeal from the contempt judgment. Thus, the court was careful to point out that it was reviewing the res judicata issue on the certified appeal only. Id.
 
 
 59
 Yet, unlike the contemnor in Marrese, the witnesses here are not parties and hence do not have the right to appeal from the ultimate judgment in the underlying lawsuit. See Union of Professional Airmen v. Alaska Aeronautical Indus., 625 F.2d 881, 884 (9th Cir.1980). Thus, allowing these witnesses to obtain immediate appellate review does not subvert the final judgment rule since any claims they have must be asserted now--on appeal from their contempt sanction--or be forever lost. In short, the majority's discussion of Marrese ignores its own admission that "a witness has appellate rights superior to those of a party."
 
 
 60
 To summarize, both traditional constitutional principles and case law make clear that a district court's power to issue discovery and civil contempt sanctions derives from and is limited by its power over the lawsuit. If subject matter jurisdiction over the action is lacking, then the district court equally lacks authority to hold these witnesses in civil contempt. With this conclusion in mind, I turn now to an analysis of the witnesses' right to challenge the district court's subject matter jurisdiction under the standing doctrine.
 
 
 61
 B. Non-Party Witnesses Must Have Standing to Challenge the District Court's Subject Matter Jurisdiction
 
 
 62
 The first and easier part of the standing question is whether the contempt order is appealable. Non-party witnesses are entitled to appeal a contempt order without waiting for final judgment to be entered in the underlying action, see, e.g., Ryan, 402 U.S. at 532, 91 S.Ct. at 1581; Cobbledick v. United States, 309 U.S. 323, 327, 60 S.Ct. 540, 542, 84 L.Ed. 783 (1940); Alexander v. United States, 201 U.S. 117, 121, 26 S.Ct. 356, 357, 50 L.Ed. 686 (1906), because insofar as the witness is concerned the cause has then become personal and final as to him. Cobbledick, 309 U.S. at 327, 60 S.Ct. at 542. A party, as distinct from the non-party witness, has no right to appeal a contempt order until final judgment is entered in the underlying lawsuit. See IBM Corp. v. United States, 493 F.2d 112, 115 & n. 1 (2d Cir.1973). The majority concedes that the present contempt order is a final judgment from which the witnesses may immediately appeal.
 
 
 63
 The second and more difficult question--and the focus of this appeal--is what may properly be reviewed on that appeal. The majority agrees that if "the absence of subject matter jurisdiction over the underlying suit would preclude the District Court from ordering a witness to produce evidence and effecting compliance," then the witnesses "would have standing to assert such a claim on appeal from an adjudication of contempt." Since a district court's civil contempt powers do depend on its underlying subject matter jurisdiction, as demonstrated above, these witnesses have standing to object to the district court's jurisdictional ruling. Despite its concession, the majority refuses to permit the witnesses to raise on appeal the only claim which, were they to succeed, would grant them effective relief. In my view this position is plainly contrary to standing doctrine principles.
 
 
 64
 Article III requires the party invoking the court's authority to demonstrate an actual or threatened injury resulting from and fairly traceable to the alleged illegal conduct. That injury must also be likely to be redressed by the relief requested. See Allen v. Wright, 468 U.S. at 751, 104 S.Ct. at 3324. Valley Forge Christian College v. Americans United for Separation of Church and State, 454 U.S. 464, 472, 102 S.Ct. 752, 758, 70 L.Ed.2d 700 (1982).
 
 
 65
 Under these principles, the witnesses clearly have standing to challenge the district court's subject matter jurisdiction. They face an actual or threatened injury. As the Supreme Court recognized in Maness v. Meyers, 419 U.S. 449, 95 S.Ct. 584, 42 L.Ed.2d 574 (1975), when a trial court orders a witness to reveal information, "[c]ompliance could cause irreparable injury because appellate courts cannot always 'unring the bell' once the information has been released. Subsequent appellate vindication does not necessarily have its ordinary consequence of totally repairing error." Id. at 460, 95 S.Ct. at 592; see also Ryan, 402 U.S. at 532, 91 S.Ct. at 1581 ("Of course, if he [the potential contemnor] complies with the subpoena he will not thereafter be able to undo the substantial effort he has exerted in order to comply"); Overby v. United States Fidelity and Guaranty Co., 224 F.2d 158, 162 (5th Cir.1955) (a non-party witness "asserting a continuing right of control of, and property right in, the documents, has standing" to appeal the district court's denial of his claim of evidentiary privilege).
 
 
 66
 This injury to the witnesses also satisfies the other standing requirements. First, it occurs as a result of allegedly illegal--or in this case unconstitutional--conduct. If, as the witnesses contend, the district court issued a discovery order without having subject matter jurisdiction over the lawsuit, then the district court exceeded the jurisdictional limits of Article III. Second, the injury is fairly traceable to the challenged action for it is the discovery order itself, the witnesses maintain, that threatens them with irreparable harm and chills their First Amendment rights. If the discovery order is upheld, but later determined to be beyond the district court's powers, then the witnesses will have been needlessly subjected to expensive, burdensome, and potentially prejudicial discovery. Obviously then, full and effective appellate review conducted before compliance must include an examination into the district court's jurisdiction.
 
 
 67
 Finally, the injury is "likely" to be redressed by a favorable decision of this Court. If we were to determine, as the witnesses urge, that the district court lacks subject matter jurisdiction over the lawsuit, then obviously the offending discovery order would be set aside. Accordingly, I would hold that the witnesses have standing on this appeal to challenge jurisdiction.
 
 
 68
 C. We Have a Sua Sponte Duty to Review the Lower Court's Subject Matter Jurisdiction
 
 
 69
 Wholly apart from the witnesses' standing, we have an independent and affirmative duty to review the lower court's authority. As the Supreme Court has recently explained, this duty derives not from a mere procedural convenience, but from the Constitution itself
 
 
 70
 Federal courts are not courts of general jurisdiction; they have only the power that is authorized by Article III of the Constitution and the statutes enacted by Congress pursuant thereto. For that reason, every federal appellate court has a special obligation to "satisfy itself not only of its own jurisdiction, but also that of the lower courts in a cause under review" ...
 
 
 71
 Bender v. Williamsport Area School Dist., 475 U.S. 534, 106 S.Ct. 1326, 1331, 89 L.Ed.2d 501 (1986) (emphasis added) (quoting Mitchell v. Maurer, 293 U.S. 237, 244, 55 S.Ct. 162, 165, 79 L.Ed. 338 (1934)). The Court continued by saying that this rule which is derived " 'from the nature and limits of the judicial power of the United States, is inflexible and without exception.' " Id. at 1334 (quoting Mansfield C. & L.M.R. Co. v. Swan, 111 U.S. 379, 382, 4 S.Ct. 510, 511, 28 L.Ed. 462 (1884)). And significantly it further stated that: " 'On every writ of error or appeal, the first and fundamental question is that of jurisdiction ... of the court from which the record comes. This question the court is bound to ask and answer for itself, even when not otherwise suggested, and without respect to the relation of the parties to it.' " Id. (emphasis added) (quoting Mansfield, 111 U.S. at 382, 4 S.Ct. at 511). See also In re Appointment of Independent Counsel, 766 F.2d 70, 73 (2d Cir.1985) ("Since the standing requirement is derived from Article III limitations on the federal courts' powers, it is the threshold issue in every case.").
 
 
 72
 My colleagues admit that we are obliged to consider the district court's jurisdiction to enter a final judgment in the underlying suit, whether or not the issue is raised by a party, but fail to recognize that on this appeal there is, of course, a final judgment before us. See Shuffler v. Heritage Bank, 720 F.2d 1141 (9th Cir.1983). In fact, we have not hesitated to examine sua sponte a district court's jurisdiction on appeal from a civil contempt order. See, e.g., Manway Construction Co. v. Housing Authority of Hartford, 711 F.2d 501 (2d Cir.1983);[1] see also Motorola, Inc. v. Computer Displays International, Inc., 739 F.2d 1149, 1153-54 (7th Cir.1984); In re Grand Jury Proceedings--Gordon, Witness, 722 F.2d 303, 305-06 & n. 1 (6th Cir.1983), cert. denied, 467 U.S. 1246, 104 S.Ct. 3524, 82 L.Ed.2d 831 (1984). Since we have a sua sponte duty to review the jurisdiction of the district court and since, as discussed above, the jurisdiction of the district court to issue civil contempt judgments derives from its jurisdiction in the underlying case, we have a sua sponte duty to decide whether the district court has jurisdiction over the underlying case.
 
 II
 
 73
 The majority's holding that non-party witnesses have no standing to challenge the subject matter jurisdiction of the underlying action has several flaws. First, and most importantly, it deprives these witnesses of any opportunity to raise a claim that might entitle them to relief. Second, it relies on an unwarranted extension of a single Supreme Court precedent. Third, it dangerously expands the limited exception under which a court may take action without a case or controversy before it. Fourth, it creates an unsupportable distinction between personal and non-personal claims. Finally, it is needlessly concerned with the possibility of collusion.
 
 
 74
 A. The Majority Denies the Witness Any Opportunity for
 
 Appellate Review
 
 75
 The majority concedes that the witnesses' contempt fines might be returned if the underlying action is eventually dismissed for want of subject matter jurisdiction. Nevertheless, it refuses to hear this claim at the only point at which the witnesses have a right to appeal. The holding assumes that the parties or the court will raise the subject matter jurisdiction issue on appeal from the underlying action. Yet an appeal from the ultimate decision is an uncertainty. Further, even if there is an appeal, the witnesses as non-parties, would not be entitled to assert the claim during that appeal.
 
 
 76
 Even if the witnesses could be assured of appellate review at the close of the underlying action, such a delay would present the witnesses with a Hobson's choice: either comply with a discovery order they find objectionable and thus suffer the very mischief they seek to avoid or be at risk for the enormous fines imposed by the district court. The majority blithely assumes that the witnesses must abandon their claim "prefer[ing] to believe that the witnesses will abide by any orders of the district court once the stay is terminated." But the law does not require such blind obedience. In United States v. Ryan, the Supreme Court stated that "respondent is free to refuse compliance and, as we have noted, in such event he may obtain full reivew of his claims before undertaking any burden of compliance with the subpoena." 402 U.S. at 532, 91 S.Ct. at 1582 (emphasis added). In Cobbledick, the Court noted that once a witness chooses to disobey a court order and is "committed for contempt ... [a]t that point the witness's situation becomes so severed from the main proceeding as to permit an appeal.... [N]ot to allow this interruption would forever preclude review of the witness' claim, for his alternatives are to abandon the claim or languish in jail." 309 U.S. at 328, 60 S.Ct. at 542.
 
 
 77
 The relevance of Ryan and Cobbledick to the instant case is obvious. These witnesses must be allowed on this appeal to raise their only challenge to the trial court's order before being compelled to comply with its dictates. Under today's holding, being held in contempt becomes not a choice, but a certainty. Absent the opportunity for full and effective review, a right to appeal after subjecting oneself to contempt is worthless. Thus, a witness will in circumstances similar to those here refuse to hazard contempt leaving compliance as the only option. To emasculate the witnesses' right to appeal by so narrow a view of what an appellate court may review, effectively deprives these contemnors of any meaningful appeal.
 
 
 78
 Further, such a limited view of an appeal is contrary to case law. In Cobbledick, the Supreme Court stated that, "[d]ue regard for efficiency in litigation must not be carried so far as to deny all opportunity for the appeal contemplated by the statute." 309 U.S. at 329, 60 S.Ct. at 543. This concept was reiterated just over a month ago in Pennsylvania v. Ritchie, --- U.S. ----, 107 S.Ct. 989, 94 L.Ed.2d 40 (1987), when the Supreme Court said that " 'statutorily created finality requirements should, if possible, be construed so as not to cause crucial collateral claims to be lost and potentially irreparable injuries to be suffered.' " Id. at 997-98 (quoting Mathews v. Eldridge, 424 U.S. 319, 331 n. 11, 96 S.Ct. 893, 901 n. 11, 47 L.Ed.2d 18 (1976)). A narrow review of the non-party witness' claims accomplishes precisely what Ritchie said lower courts should attempt to avoid.
 
 
 79
 B. The Majority's Reliance on Blair is Misplaced
 
 
 80
 The majority relies on Blair v. United States, 250 U.S. 273, 39 S.Ct. 468, 63 L.Ed. 979 (1919), as the "most pertinent authority" to resolve the issue before us. While Blair contains broad language suggesting that witnesses do not have standing to challenge a grand jury's or a court's jurisdiction, that language must be read in the context of the surrounding text. To begin, the specific holding in Blair is that a grand jury witness may not challenge the constitutionality of the statute under which the investigated conduct may be illegal. Id. at 279, 39 S.Ct. at 470. This is because, as Blair makes clear, the jurisdiction of the grand jury is not dependent upon the constitutionality of the statutes which prohibit the conduct being investigated. Thus, a declaration that the statute in Blair was unconstitutional would not give the witness the relief he sought. In this respect, Blair represents an ordinary application of the standing doctrine inapplicable in this case. Here, unlike Blair, the jurisdiction of the court to issue a contempt order is derivative of its jurisdiction over the underlying action. Thus, unlike a grand jury witness these court-ordered witnesses do have an interest in the district court's proper exercise of its authority.
 
 
 81
 Moreover, to the extent that Blair could be read broadly to prevent a witness-contemnor from challenging the subject matter jurisdiction of the grand jury on any grounds, Blair should not be extended to the courts.[2] It is clear that Blair relied on the investigative nature of the grand jury, as distinguished from Article III courts that are limited by the Constitution to deciding cases and controversies. As Blair stresses, the grand jury is "a body with powers of investigation and inquisition, the scope of whose inquiries is not to be limited narrowly by questions of propriety or forecasts of the probable result of the investigation, or by doubts whether any particular individual will be found properly subject to an accusation." Id. at 282, 39 S.Ct. at 471. The Supreme Court has noted this distinction when relying on Blair in the context of an administrative agency investigation. See, e.g., United States v. Bisceglia, 420 U.S. 141, 147-48, 95 S.Ct. 915, 919-20, 43 L.Ed.2d 88 (1975) (federal agencies have "a power of inquisition" which is "more analogous to the Grand Jury, which does not depend on a case or controversy for power to get evidence").
 
 
 82
 For this reason, we have recognized the rationale of Blair as relying on the broad investigative powers of the grand jury. See, e.g., United States v. Flood, 394 F.2d 139, 141 (2d Cir.), cert. denied, 393 U.S. 855, 89 S.Ct. 111, 21 L.Ed.2d 124 (1968). In fact, though we and other federal courts have relied on Blair in a great variety of grand jury and federal agency cases,[3] it has never been applied as the majority does here. For these reasons, reliance on Blair in the present context is misplaced.
 
 
 83
 C. The Trouble With "Colorable"
 
 
 84
 Again relying on Blair, the majority determines that a non-party witness may challenge only the "colorable" jurisdiction of the lower court. There are several problems with allowing the witnesses to attack the district court's "colorable", but not "actual", subject matter jurisdiction. First, the rule from which the majority extrapolates the "colorable"/"actual" distinction was not meant to apply in this context. There are only three instances when a district court's action is not limited by its jurisdictional power: (1) a court has power to determine its jurisdiction; (2) that same court has power to issue an injunction to preserve the status quo pending its jurisdictional determination, see United States v. Shipp, 203 U.S. 563, 573, 27 S.Ct. 165, 166, 51 L.Ed. 319 (1906) (Holmes, J.); and (3) it may enforce that injunction through criminal contempt sanctions. See United Mine Workers, 330 U.S. at 293, 67 S.Ct. at 695. From these three precisely defined rules the majority creates out of thin air an unprecedented fourth: a court without actual subject matter jurisdiction may issue a discovery order and adjudicate a civil contempt for its violation. Why create this rule? One may search in vain the whole body of the law for a good reason.
 
 
 85
 The very existence of a court presupposes its power to entertain a controversy, if only to decide that it has no power over the particular action. Thus, a court must have "jurisdiction to determine its jurisdiction" or be faced with the paradox of lacking power to decide its power.[4] Similarly, a court must be able to preserve the status quo pending its jurisdictional determination or its ultimate decision might be rendered moot. And, finally, a court must be able to enforce its authority by contempt. Without coercive power over the parties before it, a court could not dispose of cases and controversies. Justice could not be fairly administered were persons left pending adjudication free to engage in conduct that might immediately interrupt the judicial proceedings or so change the status quo that no effective judgment could later be rendered. The common link that ties these three exceptions together is the preservation of the court's ability to function and its authority to determine its jurisdiction.
 
 
 86
 This link is missing in the civil contempt context. For, unlike "sentences for criminal contempt [which] are punitive in their nature and [which] are imposed for the purpose of vindicating the authority of the court," United Mine Workers, 330 U.S. at 302, 67 S.Ct. at 700-01, civil contempt is designed to coerce compliance for the benefit of an opposing party. United States v. Russotti, 746 F.2d 945, 949 (2d Cir.1984) (civil contempt is "a remedy available only for the benefit of parties" whereas "[v]indication of the court's authority is normally accomplished by criminal contempt"); 15 C. Wright, A. Miller & E. Cooper, Federal Practice and Procedure, Sec. 3917 at 616 (1976). Unlike jurisdiction, a discovery order--which the majority concedes is "less vital to the judicial function"--is for the convenience of the parties. Consequently, while a discovery order and its enforcement through civil contempt sanctions may protect the orderly process of the lawsuit relative to the parties, it does not safeguard the court's ability to function. See Marrese, 726 F.2d at 1158.
 
 
 87
 Nevertheless, the majority views the discovery order as "sufficiently integral" to the judicial function to justify its issuance by a court without jurisdiction. This concept seems contrary to constitutional notions of jurisdiction. For example, is not personal jurisdiction equally "sufficiently integral to the judicial function"? Then, would not a district court be justified in issuing a discovery order without "actual" personal jurisdiction over the witnesses? Yet, the majority would allow the witnesses to challenge on this appeal the district court's lack of personal jurisdiction. In light of these inconsistencies, the decision to add a new exception to the three existing exceptions seems ill-advised.
 
 
 88
 The second problem with the use of the "colorable" jurisdiction standard is that it lacks a definition. Must a district court have "de facto existence and organization" as those terms are used in Blair? See 250 U.S. at 282, 39 S.Ct. at 471. Or, has the majority adopted the test of a "clear usurpation of power" used for a writ of mandamus? If used in the latter sense, then the denial of the writ--which has already occurred in this case--would terminate review, and a subsequent appeal from contempt, as this, would be meaningless. In any event, without a clear definition, the use of the term "colorable" does not lend itself to principled analysis.
 
 
 89
 Finally, the refusal to allow a challenge to actual subject matter jurisdiction is inconsistent with the holding that the witnesses may attack the district court's "colorable" jurisdiction. If subject matter jurisdiction may be raised on appeal even a little--just to see if it is "colorable"--it is therefore a reviewable matter and the question is no longer "whether" it may be raised by the witnesses, but "how much" they may raise it. Hence, the majority's holding that our review be limited to ascertaining "colorable" jurisdiction appears untenable once it concedes that the jurisdictional issue may be raised at all.
 
 
 90
 D. The Problem with "Personal"
 
 
 91
 Again, building on Blair, the majority adds a further limitation on the scope of our review on this appeal by stating that the witnesses may contest only "personal" matters. It then concludes that subject matter jurisdiction over the underlying lawsuit is not "personal" to the witnesses. At the same time, it concedes that the witnesses are entitled to challenge the district court's "colorable" jurisdiction. Under this rationale, "colorable" jurisdiction must therefore be "personal" to the non-party witnesses. No explanation is offered as to why "colorable" jurisdiction is personal to the witness while "actual" jurisdiction is not.
 
 
 92
 Further, it implies that the district court's "actual" subject matter jurisdiction would be "personal" to a party, apparently based on the belief that a party is better suited to raise this claim. Yet the prerequisite for standing is that a person be among the injured, not that such person be the most grievously or directly injured. See Kennedy v. Sampson, 511 F.2d 430, 435 (D.C.Cir.1974); see also Sierra Club v. Morton, 405 U.S. 727, 735, 92 S.Ct. 1361, 1366, 31 L.Ed.2d 636 (1972) (party seeking review must be "among the injured"). Moreover, like a witness, a party cannot waive, confer, or prevent a court's sua sponte review of subject matter jurisdiction. See, e.g., Reale International v. Federal Republic of Nigeria, 647 F.2d 330, 331 (2d Cir.1981). Hence, "actual" subject matter jurisdiction is no more "personal" to a party than it is to a witness. This difficulty merely points up the number of unanswered questions left by the "personal-non-personal" distinction. For example, what is the criteria or a "personal" claim? Must a contemnor now show as a threshold requirement that the grounds upon which he challenges the order affect his "personal" rather than "non-personal" interests?
 
 E. The Majority's Fear of Collusion
 
 93
 The final reason for a holding adopting a narrow rule of review is the fear of collusion between a party and the non-party witness. Yet, before these fears could be realized, a party would have to overcome several obstacles. It would have to find a friendly witness to subpoena; that witness must also be willing to risk being cited for contempt with the possibility of a fine or imprisonment or to gamble that the contempt order will be stayed pending appeal. Apart from these hurdles, there are other risks that the conspirators and their attorneys would be taking that are not analyzed in the majority's account. If the other party to the lawsuit got wind of such a scheme, he could bring it to the court's attention thereby subjecting the colluders to sanctions and their attorneys to possible disbarment. See Code of Professional Responsibility Canon 7, EC7-25, EC7-26. In any event, weighing the risk of collusion against the loss of a non-party witness' right to a full and effective appeal, it seems preferable to me to chance the former in order to preserve the latter.
 
 III
 
 94
 For all the above reasons, I dissent and vote to review on this appeal the merits of the witnesses' claim that they may not properly be held in contempt because the district court lacked subject matter jurisdiction over the underlying lawsuit between plaintiffs and the government defendants.
 
 
 
 *
 Judge Mansfield, originally a member of the panel, died on January 7, 1987. Judge Kearse has been appointed to the panel pursuant to Local Rule Sec. 0.14(b)
 
 
 [1]
 We need not decide whether the rule of International Business Machines Corp. v. United States, supra, would bar a party's interlocutory challenge to a civil contempt adjudication on the ground of lack of subject matter jurisdiction over the underlying lawsuit
 
 
 [2]
 Since civil contempt would very likely secure compliance with the discovery order, it would be used prior to any use of criminal contempt. See Shillitani v. United States, supra, 384 U.S. at 371 n. 9, 86 S.Ct. at 1536 n. 9. Cf. Marrese v. American Academy of Orthopaedic Surgeons, supra, 726 F.2d at 1158 (criminal contempt, though rarely imposed as sanction for violation of discovery order, imposed on a party )
 
 
 [3]
 Cf. Clarke v. Securities Industry Ass'n, --- U.S. ----, 107 S.Ct. 750, 754-59, 93 L.Ed.2d 757 (1987) (competitor suffers injury in fact from agency action permitting another to undertake certain activities and has standing if competitor's interest is arguably within the zone of interests protected by the statutory provision or constitutional guarantee allegedly violated, i.e., if competitor alleges "an injury that implicates the policies" of such provision or guarantee) (citing, inter alia, Association of Data Processing Service Organizations, Inc. v. Camp, 397 U.S. 150, 90 S.Ct. 827, 25 L.Ed.2d 184 (1970)); Baker v. Carr, 369 U.S. 186, 206-08, 82 S.Ct. 691, 704-05, 7 L.Ed.2d 663 (1962) (plaintiffs as voters had standing to challenge act that created "position of constitutionally unjustifiable inequality vis-a-vis [other] voters" and thereby disadvantaged and impaired plaintiffs' votes); see generally Heckler v. Chaney, 470 U.S. 821, 833 n. 4, 838, 105 S.Ct. 1649, 1656 n. 4, 1659, 84 L.Ed.2d 714 (1985) (leaving open whether agency non-enforcement decision would be subject to judicial review if it was "so extreme as to amount to an abdication of statutory responsibilities" or violated constitutional rights); id. at 839, 105 S.Ct. at 1660 (Brennan, J., concurring)
 
 
 [1]
 The fact that we vacated the civil contempt order in Manway after having found no subject matter jurisdiction further supports our conclusion that a district court's discovery and contempt powers are limited by its actual, and not just colorable, subject matter jurisdiction
 
 
 [2]
 While Blair refers to both the grand jury and the courts it is clear that it does so only because the grand jury issues its subpoenas in the court's name. For that reason, any indirect attack on the court in Blair was a result of the direct attack on the grand jury's investigative powers under the statute. Hence, the Supreme Court only mentioned the court's powers to the extent that the grand jury took action in its name
 
 
 [3]
 See, e.g., United States v. Sells Engineering Inc., 463 U.S. 418, 423, 103 S.Ct. 3133, 3137, 77 L.Ed.2d 743 (1983) (regarding disclosure of grand jury materials); Pillsbury Co. v. Conboy, 459 U.S. 248, 252, n. 7, 103 S.Ct. 608, 611 n. 7, 74 L.Ed.2d 430 (1983) (regarding grand jury testimony); United States v. Bisceglia, 420 U.S. 141, 147, 95 S.Ct. 915, 919, 43 L.Ed.2d 88 (1975) (IRS Summons); In re Grand Jury Matters, 751 F.2d 13, 17 (1st Cir.1984) (appeal involving attorney's refusal to testify before grand jury); In re Subpoenas to Local 478, I.U.O.E. & Benefit Funds, 708 F.2d 65, 70-72 (2d Cir.1983) (appeal from denial of motions challenging a special grand jury investigation); In re President's Commission on Organized Crime Subpoena of Scarfo, 783 F.2d 370, 372 (3d Cir.1986) (motion to quash subpoena to appear before presidential commission); United States v. (Under Seal), 714 F.2d 347, 350 n. 9 (4th Cir.) (appeal from order quashing grand jury subpoena), cert. denied, 464 U.S. 978, 104 S.Ct. 1019, 78 L.Ed.2d 354 (1983); Federal Election Commission v. Lance, 617 F.2d 365, 369 (5th Cir.1980) (en banc) (administrative subpoena enforcement proceeding), cert. denied, 453 U.S. 917, 101 S.Ct. 3151, 69 L.Ed.2d 999 (1981); In re Grand Jury Subpoena (Battle), 748 F.2d 327, 330 (6th Cir.1984) (appeal from order quashing in part grand jury subpoena); In re Bank, 527 F.2d 120, 125 (7th Cir.1975) (appeal from contempt order for refusal to testify before grand jury); In re Grand Jury Proceedings, 473 F.2d 840, 844 (8th Cir.1973) (appeal from contempt order for refusal to testify before grand jury); In re Grand Jury Investigation No. 78-184, 642 F.2d 1184, 1190 (9th Cir.1981) (appeal from disclosure of grand jury material), aff'd, 463 U.S. 418, 103 S.Ct. 3133, 77 L.Ed.2d 743 (1983); United States v. DiBernardo, 775 F.2d 1470, 1477 (11th Cir.1985) (appeal from order dismissing indictment based on errors committed during grand jury proceeding), cert. denied, --- U.S. ----, 106 S.Ct. 1948, 90 L.Ed.2d 357 (1986); United States v. Coachman, 752 F.2d 685, 691 n. 34 (D.C.Cir.1985) (appeal from contempt order for refusal to testify before grand jury)
 
 
 [4]
 The concurring opinion suggests that "jurisdiction to determine jurisdiction" may include jurisdiction to compel discovery where the jurisdictional inquiry depends on factual findings. But in most cases, including this one, such an inquiry is unnecessary because a court must accept the plaintiff's factual allegations as true when ruling on a motion to dismiss for want of standing. See Warth v. Seldin, 422 U.S. 490, 501, 95 S.Ct. 2197, 2206, 45 L.Ed.2d 343 (1975)