**BUTTS, Albert, Appellant in No. 84–1736,**

v.

**NATIONAL COLLEGIATE ATHLETIC ASSOCIATION, LaSalle University.**

**Appeal of LaSALLE UNIVERSITY, in No. 84–1729.**

**Nos. 84–1729, 84–1736.**

United States Court of Appeals, Third Circuit.

Argued Dec. 14, 1984.

Decided Dec. 20, 1984.

Howard D. Scher (Argued), Patrick T. Ryan, Montgomery, McCracken, Walker & Rhoads, Philadelphia, Pa., for LaSalle University.

Gregory T. Magarity (Argued), Wolf, Block, Schorr and Solis-Cohen, Philadelphia, Pa., for Albert Butts.

David P. Bruton (Argued), John Chesney, Drinker, Biddle & Reath, Philadelphia, Pa., for Nat. Collegiate Athletic Ass'n.

---

Before GARTH and HIGGINBOTHAM, Circuit Judges, and McCUNE, District Judge[*].

## OPINION OF THE COURT

A. LEON HIGGINBOTHAM, Jr., Circuit Judge.

This is a consolidated appeal from orders of the district court denying appellants Albert Butts and LaSalle University ("LaSalle") preliminary injunctions against enforcement of Bylaw 5–1–(d)–(3) of the appellee National Collegiate Athletic Association ("NCAA"). 600 F.Supp. 73. For the reasons set forth below, we find that it was not reversible error for the trial court to deny the preliminary injunction.

### I.

Albert Butts is an academic senior at LaSalle, a distinguished private university located in Philadelphia. LaSalle is a member of the NCAA, and it competes at the Division I level in basketball.

As an outstanding high school basketball player in the Philadelphia area, Mr. Butts attracted the attention of recruiters from many colleges and universities. His otherwise bright prospects for participation in a major intercollegiate basketball program were clouded by his academic deficiencies, which might have rendered him ineligible to compete under NCAA academic standards, or unqualified for admission to many of its member institutions. In 1979, Mr. Butts enrolled for his senior year of high school in the Frederick Military Academy in Virginia, a private preparatory school. At the end of the 1979–80 school year, during which he played on Frederick's basketball team, Mr. Butts received his high school diploma. He stayed at Frederick for the 1980–81 school year, receiving a partial scholarship in exchange for another year of participation in the school's basketball program. According to Mr. Butts, he remained at Frederick for this additional year to upgrade his academic qualifications. During the 1980–81 Fred-

erick basketball season he reached his twentieth birthday.

In the fall of 1981, Mr. Butts entered LaSalle on a full basketball scholarship. By the end of his freshman year, and first year of varsity basketball competition, school officials brought to his attention NCAA Bylaw 5–1–(d)–(3), which had been promulgated by the Division I schools in January of 1980, and which became effective August 1, 1980. The bylaw provides:

> Any participation by a student as an individual or as a representative of any team in organized competition in a sport during each 12-month period after his 20th birthday and prior to his matriculation at a member institution shall count as one year of varsity competition in that sport. Participation in organized competition during time spent in the armed services, on official church missions or with recognized foreign aid services of the U.S. Government shall be excepted.

Because Mr. Butts had played for the Frederick Military Academy basketball team after reaching the age of 20, and before matriculating at LaSalle, it was feared that under this bylaw this post-high school experience would be counted against his four years of college eligibility. After consulting with an attorney, Mr. Butts decided to take no action regarding the bylaw at that time in the hope, he testified, that the rule would be amended before his senior year. He continued to participate in LaSalle's basketball program during his sophomore and junior years (the 1982–83 and 1983–84 academic years), though he missed much of the 1983–84 basketball season due to a knee injury.

In the fall of 1984, after LaSalle determined that Mr. Butts was physically and academically eligible to compete during the current 1984–85 season, the question of his eligibility under Bylaw 5–1–(d)–(3) came to the fore. If his second year at Frederick is, under that rule, to count against his four years of college eligibility, then Mr.

[*] Honorable Barron P. McCune, United States District Court for the Western District of Pennsylvania, sitting by designation.

Butts has exhausted his eligibility and must sit out the year. On October 22, 1984 counsel for Mr. Butts wrote to the NCAA seeking a favorable interpretation of the bylaw. By letter dated November 15, 1984, the Assistant Executive Director of the NCAA indicated that Mr. Butts would be ineligible to play basketball during his senior year. LaSalle's first basketball game was scheduled for November 26. On November 23, Mr. Butts filed suit against the NCAA and LaSalle, seeking declaratory and injunctive relief. LaSalle then cross-claimed against the NCAA.

On November 26 the district court denied Mr. Butts a temporary restraining order that would have enabled him to compete in LaSalle's first game. On December 3, the district court conducted an evidentiary hearing on motions by Mr. Butts and LaSalle for preliminary injunctive relief. The district court denied these motions in a memorandum opinion and order dated December 5, finding that appellants had failed to establish a reasonable probability of success on the merits. On December 7 this court denied LaSalle's emergency motion for an injunction pending appeal, but ordered expedited briefing and argument on the merits of the appeal. Oral argument in this matter was held on December 14.

Though the complaints of LaSalle and Mr. Butts alleged a variety of constitutional and statutory defects in Bylaw 5–1(d)–(3),[1] only two are now urged before this court: (1) that the bylaw violates 42 U.S.C. § 6102 (1982) ("[N]o person in the United States shall, on the basis of age, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under, any program or activity receiving Federal financial assistance."); and (2) that it violates 42 U.S.C. § 2000d (1982) ("No person in the United States shall, on the

ground of race, color, or national origin, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance.").

The district court concluded that appellants had shown a strong likelihood that the bylaw has a racially disparate impact, and thus that they could make out a *prima facie* case under § 2000d, but that the NCAA had advanced a legitimate, nondiscriminatory reason for the bylaw: "[T]he bylaw is designed and intended to promote equality of competition among its members at each level so as to prevent college athletics and access to athletic scholarships from being dominated by more mature, older, more experienced players, and to discourage high school students from delaying their entrance into college in order to develop and mature their athletic skills." The district court held that, in response to this justification, appellants had the burden of showing that it was pretextual or that "some other, less intrusive, rule would accomplish the stated objects of the present rule." The district court found that they had not shown a reasonable likelihood of being able to meet this burden.

For the purposes of its decision on the § 6102 age discrimination claim, the district court assumed that the usual administrative exhaustion requirement imposed by that statute, 42 U.S.C. § 6104(e) (1982), would not apply where preliminary injunctive relief was necessary to prevent irreparable harm. Nonetheless, the district court concluded that under relevant regulations, 45 C.F.R. § 90.14 (1983), age combined with experience could be legitimately used as measures of the "maturity and level of athletic skill of the athlete."

---

**1.** LaSalle's complaint also challenged another bylaw, "NCAA Enforcement § 10," which provides for sanctions against member institutions that permit an ineligible athlete to compete, even if his participation was pursuant to a court order which was later vacated, stayed, or reversed. In view of its *denial* of preliminary injunctive relief, the district court found it un-

necessary to address that issue and dismissed as moot LaSalle's motion for a preliminary injunction against imposition of sanctions under § 10.

Because we now affirm the district court's denial of the preliminary injunction, we also find it unnecessary to reach the § 10 issue presented by the parties.

## II.

Though there have been many changes since, in December of 1891, James Naismith first nailed two peach baskets to the balcony ten feet above the floor at the International Young Men's Christian Association Training School, now Springfield College, Springfield, Massachusetts, basketball is still the only major sport of strictly United States origin.[2] The game was an almost instant success at the scholastic level. However, not surprisingly, it was the "acceptance by Yale in 1894 that induced other institutions to follow suit." In these early years the rules of the game varied greatly from institution to institution, with Cornell, for example, playing with 50 men per side. The first collegiate basketball game with five men on a side was played on March 20, 1897 between Yale University and the University of Pennsylvania. 3 Encyclopedia Britannica, *Basketball* 247–250 (1967).

Approximately eight years after the first intercollegiate basketball game the NCAA was born and since then it

> has played an important role in the regulation of amateur collegiate sports. It had adopted and promulgated playing rules, standards of amateurism, standards for academic eligibility, regulations concerning recruitment of athletes, and rules governing the size of athletic squads and coaching staffs.

*NCAA v. Board of Regents of the University of Oklahoma,* —— U.S. ——, 104 S.Ct. 2948, 2954, 82 L.Ed.2d 70 (1984). During the eighty years since the NCAA's birth, collegiate basketball and the NCAA have grown as dominant institutions in America at a level which Naismith could never have contemplated when he invented this sport to appease the students at Springfield who were bored with "the Swedish, German and French forms of calisthenics of that period," and because he wanted to "fill the void that existed between football and baseball." 3 Encyclopedia Britannica, *supra.*

In this case we are confronted with a clash of many intensely felt interests. No one has captured the student-athlete's interests better than Professor Linda Greene in her seminal article, *The New NCAA Rules of the Game: Academic Integrity or Racism?*, 28 St. Louis U.L.J. 101, 137 (1984), where she wrote that "athletic activities are an important and integral facet of the educational process. In addition, participation in sports activities does bestow upon the athlete important psychological, social and physical benefits." Yet, as Professor Greene goes on to note:

> The substantiality of the interest increases at the college level. This is due in part to the economic stake of the student in certain important college sports. In addition, not only is the athlete often exchanging his prowess for an education, "the chance to display ... athletic prowess in college stadiums and arenas throughout the country [may be] worth more in economic terms than the chance to get a college education." [*Quoting Behagen v. Intercollegiate Conference of Faculty Representatives,* 346 F.Supp. 602, 604 (D.Minn.1972)]. Even if the college athlete does not reach the professional ranks, our sports-dominated culture often rewards outstanding college athletes in both tangible and intangible ways. Viewed from several different perspectives, the interests of athletes cannot be lightly disregarded.

28 St. Louis U.L.J. at 137.

When stripped of legal verbiage, the competing interests in this case are those of: (1) a talented young man who fervently desires to show his athletic prowess—not primarily for success in academia but for what could be the success on the highly remunerative courts of the National Basketball Association; (2) a distinguished college that would like to demonstrate its highest excellence on the basketball floor and thereby rise as close as it can to a local, regional or maybe even a national

---

**2.** An incident in a rugby contest convinced Naismith, as he later wrote, that "there might be more effective ways of doing good besides preaching." Thus, he decided to "drop the ministry and go into this other work."

championship; and (3) a powerful collegiate association which, according to its brief, wants to thwart "professionalism" in college sports, "maintain intercollegiate athletics as an integral part of the educational process," and "ensure that athletes are representative of, and thus an integral part of, the student body as a whole."

Despite the exalted nomenclature which today's basketball afficionado might use in describing the college game, with its adroit "full-court press" defensive maneuver, or the exhilarating offensive "slam dunks," "high percentage shooters" from the outside, "good moves" to the basket, and players who can go "either way," we recognize that there is far more involved in this case than merely the joy of the sport. At stake are the size of Mr. Butts' future bank account,[3] the additional luster that could be added to LaSalle's legend of success in basketball, and the limits of the NCAA's power to curb "a persistent and perhaps inevitable desire to 'win at all costs,'" and prevent "a wide range of competitive excesses that prove harmful to students and institutions alike." *NCAA v. Board of Regents of the University of Oklahoma,* —— U.S. at ——, 104 S.Ct. at 2971 (White, J., dissenting).

### III.

"[A]n appellant who is attempting to overturn a district court order granting (or denying) a preliminary injunction carries a heavy burden." *Ciba-Geigy Corp. v. Bolar Pharmaceutical Co.,* 719 F.2d 56, 57 (3d Cir.1983), *cert. denied,* —— U.S. ——, 104 S.Ct. 1444, 79 L.Ed.2d 763 (1984). This court has often had occasion to repeat that

unless the district court abuses its discretion, commits an obvious error in applying the law, or makes a serious mistake in considering the proof, the appellate court must take the judgment of the trial court as presumptively correct. *See, e.g., Ideal Toy Corp. v. Plawner Toy Mfg. Corp.,* 685 F.2d 78, 80 (3d Cir.1982); *The Continental Group v. Amoco Chemicals Corp.,* 614 F.2d 351, 357 (3d Cir.1980); *A.O. Smith Corp. v. FTC,* 530 F.2d 515, 525 (3d Cir. 1976). "This limited review is appropriate because a court nearly always bases the grant or denial of an injunction on an abbreviated set of facts, requiring a delicate balancing of the probabilities of ultimate success at final hearing with the consequences of immediate irreparable injury that possibly could flow from the denial of preliminary relief." *Klitzman, Klitzman and Gallagher v. Krut,* 744 F.2d 955, 958 (3d Cir.1984).

Mindful of our narrow scope of review, we have carefully considered the record, Judge Fullam's thoughtful memorandum opinion, and the briefs and arguments presented by counsel in this expedited appeal. We appreciate that all parties have advanced substantial factual and legal bases for their respective positions. Each party has indicated that it may wish to introduce additional evidence at trial on the merits. Thus, we do not now intimate any view of what the final disposition of Mr. Butts' and LaSalle's complaints should be. On the record as it stands, however, we cannot say that the district court abused its discretion, committed an obvious error in applying the law,[4] or made a serious mistake in considering the proof.

---

**3.** At oral argument Mr. Butts' attorney claimed that:

> This case is moot if we do not get our preliminary injunction. Mr. Butts and the testimony from the 76ers general manager was that he is definitely a pro prospect. He cannot play today, he cannot even be considered to play in the pros today and will not be considered unless he is screened by the pros this year. We put into evidence that he is considered by the pros in one of the top 75.... and will likely go, since he is there, in the first three rounds. Where he will go or whether he will go at all completely depends, based on that

testimony, on the professional people seeing him this year. Twenty-seven games are to be played. Six have been played. He dies a little bit with each game he misses.

**4.** Appellants have isolated a number of phrases in the district court's opinion that, they contend, show that the district court applied an erroneous view of the law. We are not pursuaded that the opinion read as a whole is contrary to the applicable legal standards. If the district court's verbal formulations are in some respects arguably imprecise, parties who waited until the

Accordingly, we will affirm the district court's denial of a preliminary injunction.

eleventh hour to seek an expedited adjudication of their claims are ill-situated to complain.