**ABORTION RIGHTS MOBILIZATION, INC., et al., Plaintiffs,**

v.

**Donald T. REGAN, Secretary of The Treasury, and Roscoe L. Egger, Jr., Commissioner of Internal Revenue.**

No. 80 Civ. 5590 (RLC).

United States District Court, S.D. New York.

Feb. 27, 1985.

Marshall Beil, Carol A. Schrager, Karpatkin, Pollet, Perlmutter & Beil, New York City, for plaintiffs; Stephen B. Latham, Joyce Roop, Sybil Shainwald, New York City, of counsel.

Wilfred R. Caron, Gen. Counsel, Mark E. Chopko, Asst. Gen. Counsel, U.S. Catholic Conference, Williams & Connolly, Washington, D.C., Hughes, Hubbard & Reed, New York City, for United States Catholic Conference and National Conference of Catholic Bishops; Charles H. Wilson, Richard S. Hoffman, Washington, D.C., of counsel.

Rudolph W. Giuliani, U.S. Atty. for the Southern District of New York, New York City, for defendants; William J. Brennan, Carolyn L. Simpson, Asst. U.S. Attys., New York City, of counsel.

## OPINION

ROBERT L. CARTER, District Judge.

This renewed motion to dismiss the amended complaint for lack of subject mat-

ter jurisdiction is based upon the recent Supreme Court decision in *Allen v. Wright*, — U.S. ——, 104 S.Ct. 3315, 82 L.Ed.2d 556 (1984). The question presented is whether and to what extent the *Allen* opinion affects the outcome reached by this court in *Abortion Rights Mobilization, Inc. v. Regan*, 544 F.Supp. 471 (S.D.N.Y. 1982) (Carter, J.) ("*ARM*"), with which familiarity is assumed. *ARM* held that the clergy plaintiffs and the Women's Center for Reproductive Health had standing under the establishment clause, and that 20 individuals and three tax-exempt organizations had standing as voters in this litigation.[1]

The Supreme Court held in *Allen* that a nationwide class of parents of black children attending public schools in districts undergoing desegregation, but who had not actually been denied entry to allegedly discriminatory private schools, did not have standing to challenge the tax exempt status of those schools.

In applying *Allen* to the present case it must first be noted that the Court did not close the door on private suits challenging government grants of tax exemption, *see Allen*, 104 S.Ct. at 3332 (noting possible propriety of standing in *Coit v. Green*, 404 U.S. 997, 92 S.Ct. 564, 30 L.Ed.2d 550 (1971), *summarily aff'g. sub nom., Green v. Connally*, 330 F.Supp. 1150 (D.D.C.), which made allegations comparable to those in *Allen* but with different facts), but used traditional analysis in concluding that the *Allen* plaintiffs lacked standing.

The Court held that "the law of Art. III standing is built on a single basic idea—the idea of separation of powers." *Allen*, 104 S.Ct. at 3325. This is an integral part of the precedent upon which both *Allen* and *ARM* were decided. *See, e.g., Valley Forge Christian College v. Americans United for Separation of Church and State, Inc.*, 454 U.S. 464, 471–476, 102 S.Ct.

---

1. As a further result of *ARM*, five of the original plaintiffs, all abortion clinics, were denied standing for failure to show injury in fact and two of the original defendants, the United States Catholic Conference and the National Confer-

ence of Catholic Bishops, had the complaint against them dismissed since they were incapable of violating the First Amendment and had not violated the Internal Revenue Code in light of an explicit tax exemption from the IRS.

752, 757–761, 70 L.Ed.2d 700 (1982); *Warth v. Seldin,* 422 U.S. 490, 498, 95 S.Ct. 2197, 2204, 45 L.Ed.2d 343 (1975). Separation of powers, as *Allen,* 104 S.Ct. at 3330 n. 26, clearly demonstrates, is not a distinct line of analysis but serves as the basis of the "traceability" part of the traditional three part standing test of personal injury fairly traceable to the defendant's allegedly illegal conduct which is likely to be remedied by the requested relief. *Id.* at 3325.[2]

More specifically, plaintiffs in *Allen* asserted two types of damage: the first was characterized as either a generalized injury based upon the government's behavior in granting tax exemptions to the schools or as denigration suffered by all blacks as a result of government discrimination. In either case, the Court found the harm to be insufficiently personal to constitute a justiciable cognizable injury. *Id.* at 3326. The second alleged injury was the children's diminished ability to receive an education in a racially integrated school. *Id.* at 3328. This was found wanting because desegregated schooling was not fairly traceable to the allegedly illegal conduct of the IRS. *Id.* at 3326.

### A

■ While it is clear that stigmatizing injuries are the sort of noneconomic wrongs caused by government conduct that sometimes can be sufficient to support standing, *Heckler v. Mathews,* 465 U.S. ——, ——, 104 S.Ct. 1387, 1395, 79 L.Ed.2d 646 (1984), such status is accorded only to those who can allege a resultant harm to a concrete, personal interest. *Allen,* 104 S.Ct. at 3327–328. The *ARM* decision used this analysis to find that the lay and organizational plaintiffs did not have standing while the clergy plaintiffs and the Women's Center for Reproductive Health, a church affiliated guidance service, asserted a "compelling and personalized" injury, *ARM,* 544 F.Supp. at 479, that "diminishes their position in the community, encumbers

their calling in life, and obstructs their ability to communicate effectively their religious message." *Id.* at 480. Such allegations meet the test enunciated in *School District of Abington Township, Pa. v. Schempp,* 374 U.S. 203, 83 S.Ct. 1560, 10 L.Ed.2d 844 (1963), that would-be plaintiffs must show that they are "directly affected by the laws and practices against which their complaints are directed." *Id.* at 224 n. 9, 83 S.Ct. at 1572 n. 9.

Personal injury, however, is not enough. Plaintiffs must also clear the two additional hurdles of the standing test. This court, in *ARM,* found plaintiffs' establishment clause injury to be traceable to defendants' conduct because "[t]acit government endorsement of the Roman Catholic Church view of abortion hampers and frustrates these plaintiffs' ministries." *Id.* at 480. The court therefore found plaintiffs' asserted injuries to be traceable to "official approval of an orthodoxy antithetical to [plaintiffs'] spiritual mission." *Id.*

> Their injury flows directly from the federal defendants allowing the church defendants the privilege of retaining § 501(c)(3) status while electioneering and denying this privilege to other religious organizations. The granting of a uniquely favored tax status to one religious entity is an unequivocal statement of preference that gilds the image of that religion and tarnishes all others. A decree ordering the termination of this illegal practice and restoring all sects to equal footing will redress this injury.

*Id.*

This finding is consistent with *Allen.* *Allen* holds that tax exemption granted to an organization that allegedly practices an illegal activity does not in itself constitute the necessary connection between government action and injuries that flow from the activity. The lack of desegregated schooling, defined in *Allen* as a cognizable injury, was not found directly traceable to govern-

---

**2.** While the "fairly traceable" and "redressability" components of the constitutional standing inquiry were initially articulated as two facets of a single causation requirement, both *Allen* and *ARM* treat them as distinct inquiries for analytical purposes. *Allen,* 104 S.Ct. at 3326 n. 19; *ARM,* 544 F.Supp. at 478. The same practice will be followed here.

ment action. "From the perspective of the IRS, the injury to respondents is highly indirect and 'results from the independent action of some third party [i.e., the discriminatory private school] not before the court.'" *Allen,* 104 S.Ct. at 3328, quoting, in part, *Simon v. Eastern Kentucky Welfare Rights Org.,* 426 U.S. 26, 42, 96 S.Ct. 1917, 1926, 48 L.Ed.2d 450 (1976). The Court stated that if a direct link between tax exemption and desegregation could be established, i.e., if there were enough racially discriminatory private schools receiving tax exemptions in respondents' communities for withdrawal of those exemptions to make an appreciable difference in public school integration, then the alleged injury would be fairly traceable to unlawful IRS grants of tax exemptions. *Allen,* 104 S.Ct. at 3328.

■ Similarly, redress of the establishment clause injury sustained in *ARM* does not depend upon any action by a third party. Redress will come directly from the government's consistent enforcement of the tax laws, not from any change in the political activities of the Church. Plaintiffs' establishment clause injury centers on the quasi-official imprimatur accorded the anti-abortion activities of the Church through tax exemptions and the restrictions placed on the establishment clause plaintiffs' political activities by § 501(c)(3). Whether the allegations can be proved is not a question for this court now to decide since it must accept as true all material allegations of the complaint and construe the complaint in favor of the complaining party. *Gladstone, Realtors v. Village of Bellwood,* 441 U.S. 91, 109, 99 S.Ct. 1601, 1612, 60 L.Ed.2d 66 (1979).

It is thus apparent that *Allen* supports the court's earlier decision which denied standing under the establishment clause to those plaintiffs who, similar to those in *Allen,* asserted only general claims of denigration, but which granted standing to those plaintiffs who could pass the three part test of distinct personal injury, direct traceability, and possible redress by defendants.

**B**

■ As pointed out in the earlier opinion, it has consistently been held that voters have standing to contest the alleged infringement of their right to participate in the political process on equal terms with all others free from arbitrary government interference. *ARM,* 544 F.Supp. at 480–481 citing *Baker v. Carr,* 369 U.S. 186, 82 S.Ct. 691, 7 L.Ed.2d 663 (1962) (plaintiffs' unjustifiable inequality vis-a-vis voters in other counties justified standing); *Shakman v. Democratic Organization of Cook County,* 481 F.Supp. 1315 (N.D.Ill.1979) (standing granted to challenge patronage system because of the alleged injury to plaintiffs' interest in an equal chance and an equal voice in the election process); *Tax Analysts and Advocates v. Shultz,* 376 F.Supp. 889 (D.D.C.1974) (non-profit corporation and one of its members granted standing to challenge revenue ruling concerning campaign gifts because alleged diminution of one's vote and dilution of the ability to affect the electoral process are judicially recognized wrongs and are thus sufficient allegations of actual injury); *Common Cause v. Democratic National Committee,* 333 F.Supp. 803 (D.D.C.1971) (allegations that several national committees of political parties circumvented the statute placing limits on individual campaign contributions, thereby diluting plaintiffs' participation in the voting process, were sufficient to find standing).

Here again, mere personal injury is not enough. Defendants argue that *Allen's* yardstick in regard to traceability and redressability require that voter standing be denied in this case. Defendants, however, misconstrue the basis for the *ARM* holding that voter standing requirements have been met. The injury to plaintiffs is not, as defendants state, "alleged politicking by the Catholic Church," *Defendants' Memorandum of Law in Support of Their Renewed Motion to Dismiss* at 15, but the alleged arbitrary inequality of the plaintiffs in the political process vis-a-vis the Catholic Church created by the IRS's grant

of tax exemption to the latter. The judicially cognizable injury in *Allen* was segregated schooling which was neither created nor remediable by IRS action alone. The injury alleged in *ARM* is unequal footing in the political arena, a condition completely traceable and within the control of the IRS. The *Allen* analysis and *ARM*'s are, therefore, as one and the court's earlier holding granting standing to the present plaintiffs remains unaffected by *Allen*.

### C

■ Moreover, in *ARM*, the successful plaintiffs were found to have surmounted the three prudential limitations that can defeat standing even when the Article III case or controversy standards are met. *ARM*, 544 F.Supp. at 484. The three prudential limitations preclude standing when: (1) the harm asserted amounts to only a generalized grievance shared by a large number of citizens in a substantially equal measure, (2) plaintiffs assert the rights of third parties, or (3) abstract questions of wide public significance are presented when other governmental institutions may be more competent to decide them.[3] *Id.* (citations omitted). *Allen* does not reach these issues, but its analysis is fully congruent with *ARM*'s treatment of these considerations.

■ Concerning the "generalized grievance" limitation, *ARM* fully analyzed the specificity of the remaining plaintiffs' injuries, distinguishing the harm to clergy plaintiffs and the Women's Center for Reproductive Health from that complained of by the excluded plaintiffs as well as plaintiffs in, e.g., *Valley Forge Christian College v. Americans United for Separation of Church and State, Inc.*, 454 U.S. 464, 102 S.Ct. 752, 70 L.Ed.2d 700 (1982). *ARM*, 544 F.Supp. at 4477–480, 484. Voter standing is also particularized since plaintiffs, despite articulated desires to be politically active on behalf of their pro-choice views,

can not do so without risking their valuable § 501(c)(3) status. This personal denial of equal treatment is precisely the type of standing required by *Allen* since parent plaintiffs in that case "were not personally denied equal treatment by the challenged discriminatory conduct." *Allen*, 104 S.Ct. at 3327.

The question of whether plaintiffs are addressing other parties' rights was answered squarely in the negative by *ARM*, 544 F.Supp. at 485. Since no assertion otherwise is made by defendants and *Allen* is silent on the issue, the previous ruling need not be disturbed.

■ Finally, there is the matter of whether other governmental institutions may be more competent to decide this issue. As stated in *Allen* and noted in defendants' briefs, the separation of powers doctrine

counsels against recognizing standing in a case brought, not to enforce specific legal obligations whose violation works a direct harm, but to seek restructuring of the apparatus established by the Executive Branch to fulfill its legal duties. The Constitution, after all, assigns to the Executive Branch and not to the Judicial Branch the duty to 'take care that the laws be faithfully executed.' U.S. Const. Art. II, § 3. We could not recognize [plaintiffs'] standing in this case without running afoul of that structural principle.[26]

---

[26] ... [O]ur analysis of this case does not rest on the more general proposition that no consequence of the allocation of administrative enforcement resources is judicially cognizable.... Rather we rely on separation of powers principles to interpret the 'fairly traceable' component of the standing requirement.

*Allen*, 104 S.Ct. at 3330.

Whether courts provide an appropriate forum for deciding the matter presented thus implicates questions considered in the Article III analysis. This dovetailing of

---

**3.** The "zone of interests" test was held to be inapplicable to the *ARM* context since that test applies only to taxpayer suits and plaintiffs concede that they do not have taxpayer standing.

*ARM*, 544 F.Supp. at 484 n. 11; *see Duke Power Co. v. Carolina Environmental Study Group, Inc.,* 438 U.S. 59, 78–79, 98 S.Ct. 2620, 2633–2634, 57 L.Ed.2d 595 (1978).

constitutional and prudential concerns was explicitly recognized by *Allen:*

> Case or controversy considerations, the Court observed in *O'Shea v. Littleton,* ... 414 U.S. [488,] 499, 94 S.Ct. [669,] 677 [, 38 L.Ed.2d 674 (1974),] 'obviously shade into those determining whether the complaint states a sound basis for equitable relief.' ... Most relevant to this case is the principle articulated in *Rizzio v. Goode* ... 423 U.S. [362,] 378–379, 96 S.Ct. [598,] 607–608 [, 46 L.Ed.2d 561 (1976) ]:

> 'When a plaintiff seeks to enjoin the activity of a government agency, even within a unitary court system, his case must contend with the well-established rule that the Government has traditionally been granted the widest latitude in the dispatch of its own internal affairs,' *Cafeteria Workers v. McElroy,* 367 U.S. 886, 896 [, 81 S.Ct. 1743, 1749, 6 L.Ed.2d 1230] (1961), quoted in *Sampson v. Murray,* 415 U.S. 61, 83 [, 94 S.Ct. 937, 949, 39 L.Ed.2d 166] (1974). *Id.*

In addition to the previously discussed finding of direct harm to plaintiffs and its traceability to defendants' actions, *ARM* further addressed this final prudential concern of limiting judicial activity to the enforcement of "specific legal obligations whose violation works a direct harm," *Allen,* 104 S.Ct. at 3330, by holding that:

> Although the complaint implicates social policy issues, it does not call for judicial selection of an appropriate policy. Congress has already made that choice and set out the correct policy in § 501(c)(3); plaintiffs ask only for a judicial determination of whether defendants have observed Congress' commands concerning taxes and engaging in political activity. The prudential barriers do not restrict a court from adjudicating a claim merely because of the interplay between the litigation and social controversy.

*ARM,* 544 F.Supp. at 485.

For the above stated reasons, defendants' renewed motion to dismiss the amended complaint for lack of subject matter jurisdiction is denied.

IT IS SO ORDERED.