Dr. Lenora B. FULANI; Lenora B. Fulani's Committee for Fair Elections; and Virginia Sinclair, Plaintiffs,

v.

LEAGUE OF WOMEN VOTERS EDUCATION FUND; League of Women Voters of the United States; League of Women Voters of the City of New York Education Fund, Inc.; James Baker III, Secretary of the Treasury, Roscoe L. Egger, Jr., Commissioner of Internal Revenue, Defendants.

No. 88 Civ. 1441 (RWS).

United States District Court, S.D. New York.

April 12, 1988.

Arthur R. Block, New York City, for plaintiffs.

Arnold & Porter, Washington, D.C. (Brooksley Born, of counsel), for defendants.

Arnold & Porter, New York City (Kenneth V. Handal, of counsel), for League defendants.

Rulolph W. Giuliani, U.S. Atty., S.D.N.Y., New York City (Paul K. Milmed, Asst. U.S. Atty., of counsel), for Government defendants.

## OPINION

SWEET, District Judge.

Plaintiffs Dr. Lenora B. Fulani ("Fulani"), Lenora B. Fulani's Committee for Fair Elections, and Virginia Sinclair have moved for a temporary restraining order and preliminary injunction (a) against defendants League of Women Voters Education Fund (the "League"), League of Women Voters for the United States, and League of Women Voters of the City of New York, Inc. (collectively, the "League organizations"), restraining them from conducting any presidential primary debate to which they do not invite Fulani to participate on equal terms with the other candidates and (b) against defendants Secretary of the Treasury (the "Secretary") and Commissioner of Internal Revenue (the "Commissioner") (collectively, the "federal defendants") enjoining them to take action to cause the League to conduct the debates in a nonpartisan manner or, in the alternative, to revoke the League's exempt status under section 501(c)(3) of the Internal Revenue Code (the "Code"). Following the submission of briefs, affidavits and exhibits, oral argument was held on April 1, 1988. Upon the findings and conclusions set forth below, the motion is denied.

*The Complaint*

The complaint alleges that the exclusion of Fulani from the League's primary season debates violates her rights under the First Amendment. The complaint also asserts that Fulani's exclusion is a partisan act in violation of Internal Revenue Code section 501(c)(3), 26 U.S.C. § 501(c)(3) (1987 Supp.), and a discriminatory act on the basis of race and sex in violation of the Fourteenth Amendment and the League's obligations under Title VI of the 1964 Civil Rights Act, 42 U.S.C. §§ 2000d–2000d–4 (1981) and Title IX of the Education Amendments of 1972, 20 U.S.C. §§ 1681–1686 (1978). Finally, the complaint alleges a breach of contract claim against the League organizations for their alleged failure to be nonpartisan and to promote the inclusion of minorities and women to the fullest extent possible in the electoral process. With respect to the federal defendants, the complaint alleges that the failure of the Secretary and the Commissioner to revoke the tax exemption of the League violates both their duties under the Code and plaintiffs' rights to freedom of speech and association and to equal protection of the laws under the First and Fifth Amendments.

*The Parties*

Fulani is an African–American woman who was born and raised in Chester, Pennsylvania. She received an undergraduate degree from Hofstra University, a Master's Degree in educational psychology from Columbia University Teachers College, and a Ph.D in developmental psychology from the Graduate School and University Center of the City University of New York. Fulani has been active in electoral politics for many years, having run as an independent candidate for Lt. Governor of New York in 1982, Mayor of New York City in 1985 and Governor of New York State in 1986.

On June 24, 1987, Fulani publicly announced her candidacy for President of the

United States. She is not seeking the nomination of the Democratic or Republican parties. Running as an independent, Fulani is seeking to attain a place on the ballot in all fifty states and the District of Columbia by (a) meeting petition requirements in a number of states to have her name on the ballot as an independent, and (b) winning the nomination of several minor parties, such as the New Alliance Party, which is organized in twenty-six states, the Illinois Solidarity Party, the Peace and Freedom Party of California and the Labor Farm Party of Wisconsin, that either have a permanent ballot position or will be petitioning to attain a ballot position in 1988. As her campaign progresses, Fulani has been invited to numerous speaking engagements, forums, and interviews, at the community and local level. She has submitted unrebutted evidence that she has personally made approximately 210 campaign appearances in thirty-four states and the District of Columbia, and has appeared on thirty-eight local and regional television programs at forty-two stations based in eighteen states; eight national television programs; 174 local and regional radio programs on 158 stations based in thirty-two states; and ten nationally-syndicated radio programs. She and her campaign have been the subject of 173 articles in local and regional newspapers and ten articles in national newspapers and magazines.

On January 28, 1988, Fulani was certified by the Federal Election Commission ("FEC") as eligible for presidential primary matching funds ("primary matching funds") based on Fulani's "threshold submission," filed with the FEC pursuant to the Federal Primary Matching Payment Account Act, 26 U.S.C. § 9033 (1987 Supp.), documenting that she had received matchable contributions exceeding $5,000 from residents of at least twenty states in amounts not exceeding $250 from any one contributor. She is the only woman who has received primary matching funds in connection with the 1988 election. She is the first black woman ever to qualify for matching funds. At the time of oral argument on the instant motion, Fulani was one of sixteen candidates to have qualified for federal primary matching funds, eight of whom had terminated their candidacies.

The League is a private, non-for-profit charitable trust exempt from federal income taxes. Its goal is to foster voter education and participation in the electoral process. Since its founding in 1957, the League has sponsored four Democratic presidential primary debates, one vice-presidential general election debate, and three presidential general election debates. In 1980, the League sponsored three Republican presidential primary debates and two presidential general election debates. In 1984, the League sponsored four Democratic presidential primary debates, one vice-presidential general election debate, and two presidential general election debates. The League's debates have always included only candidates who are competing against one another in a particular election or set of elections: the Democratic presidential nomination process, the Republican presidential nomination process, or the presidential general election.

Part of the League's funding consists of grants from federal agencies. The League has received a grant from the U.S. Department of Energy in the amount of $274,287. This grant is for the purpose of conducting an education project concerning nuclear energy. The League has also received a grant from the U.S. Environmental Protection Agency ("EPA") in the amount of $100,000 for the purpose of conducting a drinking-water survey. None of the funds from these grants has been or will be used in any way in connection with the League's presidential debates. The League is not currently the recipient of any other federal funds.

*The Debates*

The League is the sole sponsor of two presidential primary debates that Fulani seeks to enjoin by her application for a preliminary injunction. The League has scheduled a debate among the candidates running in the Democratic Party primaries for April 16, 1988 in Rochester, New York, and a debate among the candidates running in the Democratic Party primaries for June

5, 1988 in Torrance, California.[1] The purpose of the League's primary debates is to educate the nation's electorate about the issues in the primary election campaigns and about the positions of the candidates running in those elections and to stimulate increased voter interest and participation in the electoral process. The League scheduled separate Democratic and Republican primary debates in order to permit the voters to hear debate among the candidates who are competing against one another and in order to assist voters in making an informed choice among them.[2]

The League invited candidates to participate in the presidential primary election debates after applying participant selection criteria adopted by the Board of Trustees of the League on April 2, 1987. The basic criteria the League adopted for selection of participants in the presidential primary debates are as follows:

1. The candidate must have made a public announcement of his or her intention to run for the Democratic (or Republican) Party's nomination for President.

2. The candidate must be legally qualified to hold the office of President.

3. The candidate must be a significant candidate for the Democratic (or Republican) Party's nomination for President.

Under the first criterion, only Democratic candidates have been invited to participate in the Democratic primary debates, and only Republican candidates have been invited to participate in the Republican primary debates. In assessing the significance of a candidacy, the League considers a number of factors, including:

> Eligibility for matching payments under the Presidential Primary Matching Payment Account Act (26 U.S.C. Chapter 96).
>
> .   .   .   .   .
>
> Active campaigning in a number of states for the [Democratic or Republican] Party's nomination.
>
> .   .   .   .   .
>
> Recognition by the national media as a candidate meriting media attention.
>
> .   .   .   .   .
>
> Other factors ... that in the League's good faith judgment may provide substantive evidence of nationwide voter interest in a candidate, such as the extent of campaign contributions and national voter poll results.

"1988 League of Women Voters Education Fund Democratic Presidential Primary Debates Participant Selection Criteria."

Fulani is a declared independent and minor-party candidate for the presidency. Fulani's name was on the ballot in the presidential preference primary of the Illinois Solidarity Party held on March 15, 1988. Fulani will also be on the ballot in the presidential preference primaries of the New Alliance Party of Nebraska on May 10, 1988 and the Peace and Freedom Party

1. It appears that debates among the candidates running in the Republican Party primaries scheduled for April 17, 1988 and June 4, 1988 in New York and California, respectively, have been cancelled by the League on the basis of its determination that at the present stage of the campaign there is insufficient voter interest in Republican primary debates.

2. The League plans to present a series of presidential general election debates in the fall of 1988 involving candidates for the presidency and the vice-presidency. The debates are scheduled for September 8, 1988, in Birmingham, Alabama; October 6, 1988 in Minneapolis–St. Paul, Minnesota; October 23, 1988 in Boston, Massachusetts; and November 1, 1988 in Los Angeles, California. One of the debates will involve vice-presidential candidates, while three of the debates will involve presidential candidates. The League will consider sending invitations for these debates after the Republican and Democratic parties have chosen their nominees.

On October 6, 1987, the Board of the League adopted the "1988 League of Women Voters Education Fund Candidate Selection Criteria for General Election Debate Participation." Under the selection criteria the League will sponsor one presidential general election debate to which it will invite only the nominees of the two major parties. The League's Board decided to invite the major party nominees and any other significant candidates for the presidency who meet the selection criteria of the League to the other two presidential general election debates sponsored by the League. The Board of the League decided to hold one debate between the nominees of the two major parties in order to insure that the nation's voters are given at least one opportunity to hear the two major parties' nominees debate each other one-on-one.

of California on June 7, 1988. Fulani is circulating petitions to gain access to the ballot in many other states.

In December 1987 Fulani's representatives requested that the League invite her to participate in its presidential primary election debates. The request was denied on the grounds that Fulani is not a publicly announced candidate for either the Democratic or Republican nomination for President and, therefore, does not meet a prerequisite for invitation to participate in the League's presidential primary debates. Because Fulani did not meet this prerequisite for an invitation, the League did not consider whether she met any of its other criteria, including whether she is a significant candidate.

### The Parties' Contentions

Fulani asserts that the League is required to be nonpartisan in its activities by virtue of its tax-exempt status under section 501(c)(3) of the Code and that, as a recipient of federal funds, the League is prohibited from discriminating on the basis of race or sex pursuant to Title VI and Title IX. Further, Fulani contends that the League's sponsorship of presidential primary debates is state action and thereby subject to the guarantees of the First and Fourteenth Amendments. Fulani alleges that her exclusion from the presidential primary debates on the grounds that she is not seeking the nomination of the Democratic or Republican parties is partisan and a violation of section 501(c) of the Code. She also contends that her exclusion is discriminatory on the basis of race and sex in violation of Title VI and Title IX.

The League responds that its selection criteria for the presidential primary debates are nonpartisan under both the FEC's regulations and rulings and the Code. The League asserts that Fulani's constitutional claims are baseless because (1) the League's debates do not involve state action and, even if they did, (2) the First Amendment does not guarantee the right to participate in a candidate's debate and (3) the League has not discriminated against Fulani on the basis of race or sex.

Finally, the League contends that Fulani's Title VI and Title IX claims are without merit because there is no evidence that the conduct of the League's debates has had an adverse disparate impact on blacks or women.

The federal defendants contend that, because Fulani lacks standing to challenge the government's tax treatment of the League, there is no jurisdiction to entertain her suit. The federal defendants also contend that Fulani's exclusion from the Republican and Democratic primary debates does not give rise to a claim that the League is not entitled to a tax exemption under section 501(c)(3) of the Code.

As the Second Circuit has recently reaffirmed, a preliminary injunction is an extraordinary and drastic remedy not to be routinely granted. *Hanson Trust PCL v. ML SCM Acquisition Inc.*, 781 F.2d 264, 273 (2d Cir.1986). To prevail on their application for a preliminary injunction, the plaintiffs face:

> the formidable task of showing: (1) irreparable harm and (b) either (1) likelihood of success on the merits or (2) sufficiently serious questions going to the merits to make them a fair ground for litigation and a balance of hardships tipping decidedly toward [the plaintiffs].

*Id.* "Furthermore, equitable considerations are important in the determination whether to grant preliminary relief." *WPIX v. League of Women Voters*, 595 F.Supp. 1484, 1487 (S.D.N.Y.1984).

### State Action

■ A necessary element of Fulani's constitutional claims is a finding that the League's decision to exclude Fulani from its presidential primary debates involved state action. Whether ostensibly private conduct can properly be equated with government conduct so as to invite constitutional scrutiny is an issue that Professor Charles L. Black, Jr. once described as "the most important problem in American law." Black, *"State Action," Equal Protection, and California's Proposition 14*, 81 Harv. L.Rev. 69 (1967). A court's inquiry into the presence of state action must be guided in

part by Mr. Justice Clark's observation in *Burton v. Wilmington Parking Authority*, 365 U.S. 715, 722, 81 S.Ct. 856, 860, 6 L.Ed.2d 45 (1961) that "[o]nly by sifting facts and weighing circumstances can the nonobvious involvement of the State in private conduct be attributed its true significance."

The League, a private, not-for-profit charitable trust, is the sole sponsor of the presidential primary debates at issue here. Courts have held that no state action exists when a private organization holds a candidates' debate. In *Kay v. New Hampshire Democratic Party*, 821 F.2d 31 (1st Cir. 1987), the Court of Appeals for the First Circuit held that no state action existed with respect to a presidential candidates' forum sponsored by the New Hampshire Democratic Party, stating, "in holding the forum, the Party was not engaged in governmental activity." *Id.* at 33. In an action involving similar facts, a federal district court in New Hampshire held: "[N]o governmental action is involved when the New Hampshire Democratic Party seeks to invite one, three, or twelve candidates to debate the issues of the campaign." *Koczak v. Grandmaison*, 684 F.Supp. 763, 764 (D.N.H.1988). *But cf. Martin–Trigona v. University of New Hampshire*, 685 F.Supp. 23 (D.N.H.1988) (finding state action where state university holds a political debate among Democratic presidential primary candidates).

Fulani seeks to distinguish the New Hampshire cases on the grounds that they involved a political party, not a tax-exempt organization such as the League. Fulani's claim that the League's sponsorship of the presidential debates constitutes state action relies heavily on the Honorable Abraham D. Sofaer's consideration of the League's activities in *WPIX v. League of Women Voters*, 595 F.Supp. 1484 (S.D.N.Y.1984). The decision in *WPIX*, which denied a preliminary injunction against a presidential general election debate sponsored by the League in 1984, involved the assertion of First Amendment rights of press access to that debate. The plaintiff, a producer of a syndicated national news program, sought reasonable access to the debate for two television cameras. Prior to the plaintiff's request, the League had announced its decision to require pooled coverage of the debates and had accepted a proposal from the three major networks and Cable News Network to form a pool.

Although the court denied the plaintiff's request for a preliminary injunction on equitable grounds, the court stated, *in dictum*, that the "plaintiff has raised a substantial possibility that it will be able to prove that the League's decision to deny access to any but the pooled cameras is state action." *WPIX*, 595 F.Supp. at 1489. The court analyzed the League's role in sponsoring and organizing presidential debates in light of the five factors articulated by the Second Circuit in *Jackson v. Statler Foundation*, 496 F.2d 623 (2d Cir.1974), as important to a determination of state action. The *Statler* state action factors are:

> (1) the degree to which the "private" organization is dependent on governmental aid; (2) the extent and intrusiveness of the governmental regulatory scheme; (3) whether that scheme connotes government approval of the activity or whether the assistance is merely provided to all without such connotation; (4) the extent to which the organization serves a public function or acts as a surrogate for the State; (5) whether the organization has legitimate claims to recognition as a "private" organization in associational or other constitutional terms.

*Jackson v. Statler Foundation*, 496 F.2d at 629. The *WPIX* court indicated that the following aspects of the League's activities weighed in favor of a finding of state action: (1) the League had consulted with candidates who received substantial public funds for their campaigns, (2) the debates would be broadcast over television in accordance with regulations of the FEC and the Federal Communications Commission, (3) the League had institutionalized its role as the sole organizer of the debates for three successive presidential elections, (4) the League's motivation in conducting the debates was "purely public and education-

al," and (5) the League had not invoked any private property rights to deny access to the debates. *WPIX,* 595 F.Supp. at 1488–89.

The League seeks to distinguish on its facts the *WPIX* court's discussion of whether the debates involve state action. First, the League asserts, and Fulani does not dispute, that there has been no input from any public official concerning the selection of participants in the debates at issue here. Second, the League notes that at least twenty-five presidential primary debates have been sponsored by other entities during this campaign season, none of which has been a government. This fact, the League contends, disproves the *WPIX* court's suggestion that the League's sponsorship of the primary debates is a governmental function.

Apart from these factual distinctions, the *WPIX* court's discussion of the state action issue was premised almost exclusively on the *Statler* five factor analysis. The court did not address cases decided after *Statler* in which the Supreme Court has applied a more restrictive concept of state action than that which would appear to be permissible under what Judge Friendly described as the Second Circuit's "loose characterization" of the doctrine. *See Jackson v. Statler Foundation,* 496 F.2d at 637 (Friendly, J., dissenting from denial of reconsideration en banc). Examination of the holdings in those cases reveals that the Court has tightened the proof required for a showing of state action.

In *San Francisco Arts & Athletics, Inc. v. United States Olympic Committee,* —— U.S. ——, 107 S.Ct. 2971, 97 L.Ed.2d 427 (1987), the Supreme Court held that the decision of the United States Olympic Committee ("USOC") to enforce a trademark in the word "Olympic" did not involve governmental action. The USOC is a private,

not-for-profit corporation established under federal law. *See* 36 U.S.C. § 378 (1988). Its funding is provided, in part, through the exclusive use of the Olympic words and symbols and through direct grants from the Secretary of Commerce. *See* 36 U.S.C. §§ 380, 384 (1988). The USOC was granted the exclusive use of the word "Olympic" by act of Congress. *See* 36 U.S.C. § 380 (1988). At the end of each calendar year, the USOC is required by law to submit a detailed report of its operations to the President and to both Houses of Congress. *See* 36 U.S.C. § 382a (1988). Despite this bundle of government grants and regulations, the Supreme Court concluded that the USOC's acts could not be attributed to the government.[3]

The Court relied on its past state action decisions that limit the scope of the *Statler* five factor analysis; namely, (1) that the government may subsidize private entities without assuming constitutional responsibility for their actions, *see Blum v. Yaretsky,* 457 U.S. 991, 1011, 102 S.Ct. 2777, 2789, 73 L.Ed.2d 534 (1982); (2) that the fact that a private entity performs a function that serves the public does not make its acts governmental action, *see Rendell–Baker v. Kohn,* 457 U.S. 830, 842, 102 S.Ct. 2764, 2772, 73 L.Ed.2d 418 (1982); and (3) that even extensive regulation by the government does not transform the actions of the regulated entity into those of the government, *see Jackson v. Metropolitan Edison Co.,* 419 U.S. 345, 350, 95 S.Ct. 449, 453, 42 L.Ed.2d 477 (1974). *See San Francisco Arts & Athletics v. USOC,* 107 S.Ct. at 2985–86. Most important, the Court read its prior state action decisions as holding that a "government 'normally can be held responsible for a private decision only when it has exercised coercive power or has provided such significant encourage-

**3.** The Court made clear its concern that private, not-for-profit organizations not be made subject to suits for alleged constitutional violations simply on account of their federally created or nonprofit status: "It need hardly be said that if federally created private corporations were to be viewed as governmental rather than private actors, the consequences would be far-reaching. Apart from subjecting these private entities to suits under the equal protection component of the Due Process Clause of the Fifth Amendment, presumably—by analogy—similar types of nonprofit corporations established under state law could be viewed as governmental actors subject to such suits under the Equal Protection Clause of the Fourteenth Amendment." *San Francisco Arts & Athletics v. USOC,* 107 S.Ct. at 2984 n. 23.

ment, either overt or covert, that the choice must in law be deemed to be that of the [government].' *Blum v. Yaretsky, supra." Id.* at 2986.

The facts of the instant case, in the light of the Supreme Court's recent decisions, bar a finding that the League's decision to exclude Fulani from the presidential primary debates involved governmental action. Although the League does receive a federal subsidy both through its tax exemption and separate grants from federal agencies, government subsidization alone will not turn private conduct public. Similarly, since government subsidies are rarely bestowed without accompanying government regulation, which has been held not to transform the actions of the regulated entity into those of the state, the fact that both the FEC and the Code govern aspects of the League's activities does not make it a state actor. Further, while but for its tax exempt status, the League would not be permitted under FEC regulations to sponsor a debate, its decision to exercise its right to hold a debate does not require government input. *Cf. San Francisco Arts & Athletics v. USOC*, 107 S.Ct. at 2986. Finally, although the League's objective is to promote educational programs that benefit the public, there has been no showing that its sponsorship of presidential primary debates constitutes the performance of a "public" function, let alone a function that has been "traditionally the exclusive prerogative of the State." *Jackson*, 419 U.S. at 353, 95 S.Ct. at 454–55. Therefore, because the League is not a governmental actor, the prohibitions of the Constitution do not apply to its decision to exclude Fulani from its presidential primary debates.[4]

*Fulani's Title VI and Title IX Claims*

■ Fulani claims that the League's criterion restricting participation in the primary debates to Democratic or Republican candidates discriminates against her on the basis of race and sex in violation of Title VI and Title IX.[5] As discussed above, the League receives federal assistance indirectly through its tax exemption and directly through grants from the Department of Energy and the EPA. Therefore, there is jurisdiction over Fulani's private right of action to enforce the proscriptions of Title VI and Title IX. *See Guardians Association v. Civil Service Commission of the City of New York*, 463 U.S. 582, 594–95, 103 S.Ct. 3221, 3228–29, 77 L.Ed.2d 866 (1983); *see also Cannon v. University of*

---

**4.** Even if the League's decision to exclude Fulani from the debates could be deemed to involve state action, there is no merit to her First Amendment claim. In *Johnson v. Federal Communications Commission*, 829 F.2d 157 (D.C.Cir. 1987), the Court of Appeals for the District of Columbia Circuit considered a challenge by the Citizens Party's Presidential and Vice Presidential candidates to the League's refusal to include them in its 1984 Presidential and Vice Presidential general election debates between the nominees of the Democratic and Republican parties. The court held that the minor-party candidates had no right under either the First Amendment or the Communications Act of 1934 to be included in those debates. *Johnson*, 829 F.2d at 160. The court cited *Columbia Broadcasting System, Inc. v. Democratic National Committee*, 412 U.S. 94, 93 S.Ct. 2080, 36 L.Ed. 2d 772 (1973), as holding that no individual member of the public has a right to broadcast her own particular views on any matter. *Id.* at 162; *see also Martin–Trigona v. University of New Hampshire*, M. 87–56–D, slip op. (D.N.H. Jan. 5, 1988) ("The First Amendment does not guarantee the right to communicate one's views at all times and places or in any manner that may be desired.") (citing *Heffron v. International Soc. for Krishna Consciousness*, 452 U.S. 640, 647, 101 S.Ct. 2559, 2564, 69 L.Ed.2d 298 (1981).

Fulani's attempt to buttress her First Amendment claim by citing to the Supreme Court's voting rights cases, *see, e.g., Anderson v. Celebrezze*, 460 U.S. 780, 103 S.Ct. 1564, 75 L.Ed.2d 547 (1983); *Terry v. Adams*, 345 U.S. 461, 73 S.Ct. 809, 97 L.Ed. 1152 (1953); *Smith v. Allwright*, 321 U.S. 649, 64 S.Ct. 757, 88 L.Ed. 987 (1944), is unavailing. *See Johnson*, 829 F.2d at 164–65 (distinguishing the Supreme Court's voting rights and ballot access cases).

**5.** Section 601 of Title VI, 42 U.S.C. § 2000d (1981), prohibits race discrimination in "any program or activity receiving Federal financial assistance." Section 901(a) of Title IX, 20 U.S. C. § 1681 (1978), prohibits sex discrimination in "any education program or activity receiving Federal financial assistance."

In view of the holding above that the League's decision not to invite Fulani to participate in the primary debates does not involve state action, her claim of race and sex discrimination in violation of the Fourteenth Amendment will not be considered.

*Chicago,* 441 U.S. 677, 99 S.Ct. 1946, 60 L.Ed.2d 560 (1979).

Title VI requires proof of actual intentional discrimination on the basis of race. *See Guardians Association,* 463 U.S. at 608 n. 1, 103 S.Ct. at 3235–36 n. 1 (Powell, J., concurring in judgment); *Lora v. Board of Education,* 623 F.2d 248, 250 (2d Cir. 1980). Similarly, Title IX requires that a plaintiff show intentional sex discrimination. *Cannon v. University of Chicago,* 648 F.2d 1104, 1109 (7th Cir.), *cert. denied,* 454 U.S. 1128, 102 S.Ct. 981, 71 L.Ed.2d 117 (1981); *Nagel v. Avon Board of Education,* 575 F.Supp. 105, 109 (D.Conn.1983). Because the record here is wholly devoid of any showing that the League has intentionally discriminated against Fulani on the basis of her race or sex, it would appear that her Title VI and Title IX claims must fall. However, in *Guardians Association,* a majority of the Court held that proof of disparate impact would be sufficient to establish liability when the suit is brought to enforce regulations adopted pursuant to Title VI. *Guardians Association,* 463 U.S. at 608 n. 1, 103 S.Ct. at 3235–36 n. 1 (Powell, J., concurring in judgment); *see Alexander v. Choate,* 469 U.S. 287, 293, 105 S.Ct. 712, 716, 83 L.Ed.2d 661 (1985) (explaining the holdings in *Guardians Association* ). Assuming, without deciding, that a similar showing is sufficient for the purposes of regulations adopted pursuant to Title IX, the court will consider whether there is merit to Fulani's claim of disparate impact.

The Department of Energy has promulgated a nondiscrimination regulation that provides, *inter alia,*

> A recipient [of federal assistance] ... may not directly or through contractual or other arrangements utilize criteria or methods of administration which have the effect of subjecting individuals to discrimination because of their race, color, national origin, or sex ... or have the effect of defeating or substantially im-

pairing accomplishment of the program objectives with respect to individuals of a particular race, color, national origin, or sex....

10 C.F.R. § 1040.13(c) (1987). Fulani contends that she has been excluded from the League's presidential primary debates on the basis of a selection criterion that is neutral on its face but severely discriminatory in effect. The criterion is the distinction between major party candidates and non-major party candidates. Neither the Republican or the Democratic party has ever nominated an African–American or a woman for the presidency. By comparison, Fulani asserts, seven African–Americans have run for President as independents or minor party candidates. On the basis of these assertions, Fulani claims that the League's use of a major party affiliation as a criterion for participation in its primary debates has an adverse disparate impact on blacks and women.

At this stage of the litigation, Fulani has not demonstrated the likelihood that she will be able to prevail on her claim of disparate impact. Although she has presented undocumented historical data listing black and female presidential and vice-presidential candidates from minor parties, she has not identified the race and sex of the 140 current non-major party presidential candidates or the race and sex of the 141 current candidates for the Republican or Democratic nomination. That neither major party has ever nominated a black or a woman for the presidency is not proof that the League's criterion for its primary debates has a disproportionate impact on blacks or women.[6]

Moreover, as the Supreme Court concluded in *Personnel Administrator of Massachusetts v. Feeney,* 442 U.S. 256, 274–75, 99 S.Ct. 2282, 2293–94, 60 L.Ed.2d 870 (1979), disproportionate impact fails to evince an improper purpose when a believable, historically accepted and nondiscrimi-

---

**6.** *See, e.g., Butts v. National Collegiate Athletic Association,* 600 F.Supp. 73, 75 (E.D.Pa.) (plaintiff showed that a rule requiring that each year of pre-collegiate basketball competition after age 20 be counted against collegiate eligibility had a disparate impact on blacks because the actual pool of applicants for college athletic programs contained a much higher percentage of blacks over the age of 20 than whites of that age), *aff'd,* 751 F.2d 609 (3d Cir.1984).

natory explanation is available. *See also Bryan v. Koch*, 492 F.Supp. 212, 220–21 (S.D.N.Y.), *aff'd*, 627 F.2d 612 (2d Cir.1980). The League has advanced such a reason for limiting the debates to participants who are candidates for the Republican or Democratic nomination: the purpose of the primary debates is to educate citizens who will vote in a particular primary about candidates who are running against each other in that primary. Fulani has not established that the League's explanation is a pretext for race or sex discrimination. At present, the record shows that one non-major party candidate, Fulani, is black and female, and that one major party candidate, Jesse Jackson, is black and male. Therefore, there is no basis for the issuance of a preliminary injunction on Fulani's Title VI and Title IX claims.

*Fulani's Section 501(c)(3) Claim*

■ The government defendants contend that Fulani does not have standing to maintain an action to force the government to revoke the League's tax exemption on the ground that the League allegedly has not complied with the statutory conditions for retaining its exemption. In response, Fulani relies on two decisions by the Honorable Robert L. Carter in *Abortion Rights Mobilization, Inc. v. Regan*, 544 F.Supp. 471 (S.D.N.Y.1982) (first motion to dismiss), 603 F.Supp. 970 (S.D.N.Y.1985) (renewed motion to dismiss), to support her claim to standing. Although the question of Fulani's standing raises difficult issues, it need not detain the court on this expedited application for a preliminary injunction. Proceeding directly to the merits, Fulani's claim that the League has conducted its primary debates in a partisan manner has no support in law or fact.

Section 501(c)(3) of the Code provides that a tax-exempt organization may not "participate in or intervene in (including the publishing or distributing of statements), any political campaigns on behalf of (or in opposition to) any candidate for public office." I.R.C. § 501(c)(3) (1986), as amended by the Revenue Act of 1987, P.L. 100–203. In Revenue Ruling 78–248, 1978–1 C.B. 154, the Internal Revenue Ser-

vice gave some guidance as to what kinds of voter education activities a 501(c)(3) tax-exempt organization might engage in without violating the Code's ban on political activity. The Revenue Ruling states that "certain 'voter education' activities conducted in a non-partisan manner may not constitute prohibited political activity" but that others might. The ruling goes on to give four examples of voter education activities that would be considered partisan, none of which involve public debates.

In support of her claim that the League's primary selection criteria are biased against minor party candidates, Fulani points to the fact that the FEC has interpreted the Federal Election Campaign Act of 1971, 2 U.S.C. § 431 *et seq.* (1982), to mean that presidential candidates from minor parties may receive federal matching funds in the same way as candidates from major parties. Fulani asserts that her qualification by the FEC for primary matching funds under the Presidential Primary Matching Payment Account Act establishes that she is in fact a primary candidate. As a primary candidate who has qualified for primary matching funds, Fulani now seeks to participate on an equal footing with all other party candidates, irrespective of party affiliation.

The League and the federal defendants join in arguing that Fulani's claim of a right to participate in a debate among candidates of a single party (of which she is not a member) who are seeking that party's nomination (which she is not seeking) is groundless on its face. The FEC regulations governing nonpartisan candidate debates under the Federal Election Campaign Act lend support for their position. The FEC regulations provide, in part:

(a) *Staging organization.* (1) A nonprofit organization which is exempt from federal taxation under 26 U.S.C. § 501(c)(3), ... and which does not endorse, support or oppose political candidates or political parties may stage nonpartisan candidate debates in accordance with 11 CFR 110.3(b) and 114.4(e) ...

(b) *Debate structure.* The structure of debates staged in accordance with 11

CFR 110.13 and 114.4(e) is left to the discretion of the staging organization, provided that (1) such debates include at least two candidates, and (2) such debates are nonpartisan in that they do not promote or advance one candidate over another.

11 C.F.R. § 110.13 (1987). In its Explanation and Justification for its regulations, the FEC stated:

> For debates at the primary, caucus or convention level, a staging organization may restrict participation to candidates seeking the nomination of one party. Moreover, if a staging organization restricts participation to candidates seeking the nomination of one party, there would be no requirement to stage a debate for candidates seeking the nomination of any other party....

44 Fed.Reg. 76,734–35 (Dec. 27, 1979). Thus, the FEC, which is the governmental entity charged with enforcing the laws relating to federal election campaigns,[7] has expressly determined that a primary debate is nonpartisan under the Federal Election Campaign Act even if participation is restricted to candidates seeking the nomination of one party.

The FEC has determined that the League has no obligation to hold a primary debate for every party and that its obligation to be nonpartisan extends only to candidates running against each other for a particular party's nomination. The League is not responsible for the predominance of the two major parties in American politics nor for the existence of a primary season during which the major parties nominate their candidates for the presidency. Although the League obviously operates within the parameters of the present system, the League cannot be held responsible for the disadvantage at which the system places minor party candidates. Moreover, while the League's primary debates may, in the public's eye, implicitly endorse the primacy

of the two major parties, the League's influence in this regard is insignificant in comparison to the reinforcement given to the major party system each day by the morning newspapers and evening news programs. In sum, there is no basis on which the court could find that the League's practice of inviting only Democratic candidates to the Democratic primary debates and only Republican candidates to the Republican primary debates is a partisan act in violation of the League's tax-exempt status under the Code.

*Fulani's Contract Claim*

■ Fulani's contract claim against the League organizations is based upon Article II of the League's Trust Agreement which prohibits the League from engaging in partisan activity. In view of today's holding that the League's sponsorship of the presidential primary debates is not a partisan activity, Fulani's contract claim is without merit.

Upon the findings and conclusions set forth above, Fulani has failed to establish either a likelihood of success on the merits or sufficiently serious questions going to the merits. Therefore, the motion for a preliminary injunction is denied. The complaint will be dismissed as against the federal defendants, and counts three and four of the complaint will be dismissed as against the League organizations.

IT IS SO ORDERED.

---

**7.** The Federal Election Campaign Act, 2 U.S.C. § 437c(b)(1) (1985), grants the FEC exclusive jurisdiction with respect to the civil enforcement of the provisions of the statute. Section 437h provides for review of an FEC decision by a district court. Although Fulani has circum-

vented the FEC's exclusive jurisdiction in this action against the federal defendants, the law requires that any direct challenge to the League's compliance with the FEC's regulations be filed in the first instance with the FEC. 2 U.S.C. § 437c(b)(1) (1985).